**COLE v. LOEW'S INCORPORATED.**

No. 8005.

United States District Court
S. D. California, C. D.

Dec. 20 and 30, 1948.

## Introductory Statement of Facts

### (1) The Pleadings

The action, originally filed on January 7, 1948, by the plaintiff, in the Superior Court of the State of California, was removed to our court by the defendant under the diversity statute as it then read. 28 U.S.C.A. §§ 41(1) (b), 71, [now § 1331 et seq.]. By his Complaint, the plaintiff sought declaratory relief and general equitable relief. The controversy centered around a notice served on the plaintiff by the defendant on December 2, 1947, suspending him from his employment as a writer for motion pictures for alleged violation of a clause in his contract of employment.

The plaintiff contended that his suspension was invalid. This, the defendant denied, seeking, in turn, a declaration to the effect that the suspension was warranted by the contract of employment and by the law of contracts.

### (2) The Admitted Facts

A pre-trial order, dated November 22, 1948, admitted the following facts to be true:

(A) Plaintiff is a resident of the county of Los Angeles, state of California.

(B) Defendant Loew's Incorporated is a corporation organized under the laws of Delaware, maintains a principal office and transacts business in the county of Los Angeles, state of California.

(C) The matter in controversy, exclusive of interest and costs, exceeds in value the sum of $3,000.

(D) Plaintiff is by profession a writer, and has had long experience in working in such capacity in the motion picture industry.

(E) Defendant Loew's Incorporated is engaged, among other things, in the business of producing motion pictures.

(F) On or about December 5, 1945, in the county of Los Angeles, state of California, plaintiff and defendant Loew's Incorporated entered into a contract of employment, a copy of which was attached to the Order.

(G) The contract, generally, was prepared by defendant Loew's Incorporated; and paragraphs 8, 9, 11 and 12 thereof are on a form generally used by said defendant.

(H) The contract was amended by a letter agreement, dated August 21, 1947 and prepared by Loew's Incorporated.

(I) No defendant other than Loew's Incorporated entered into the agreement referred to herein in paragraphs "F" and "H".

(J) The parties to said agreements commenced to perform their respective obligations under said agreements on or about December 5, 1945.

(K) Plaintiff well and truly performed all writing services required of him until on or about December 2, 1947.

(L) Defendant Loew's Incorporated well and truly performed each and every obligation of said agreements on its part to be performed until December 2, 1947.

(M) On or about December 2, 1947 defendant Loew's Incorporated delivered to plaintiff a certain written notice, a copy of which is attached hereto and marked "Plaintiff's Exhibit 3". Since the delivery of said notice neither plaintiff nor defendant Loew's Incorporated has rendered any performance under said agreement; but plaintiff has been and is ready and willing to render his said services.

(N) On October 30, 1947 plaintiff Lester Cole appeared as a witness before the Committee on Un-American Activities of the House of Representatives, Eightieth Congress, First Session, at Washington, D. C., pursuant to a subpoena theretofore served upon him compelling him to appear before said Committee. Lester Cole was

sworn and then and there testified as follows:

"Mr. Stripling. Mr. Cole, will you please state your full name and present address?

"Mr. Cole. Lester Cole, 15 Courtney Avenue, Hollywood, Calif.

"Mr. Stripling. When and where were you born, Mr. Cole?

"Mr. Cole. I was born June 19, 1904, in New York City.

"Mr. Stripling. What is your occupation?

"Mr. Cole. I am a writer.

"Mr. Stripling. How long have you been a writer?

"Mr. Cole. For approximately 15, 16 years.

"Mr. Stripling. How long have you been in Hollywood?

"Mr. Cole. Since—I first came to Hollywood in 1926; I left and went back to New York in 1929; returned in 1932, and have been there ever since.

"Mr. Stripling. Are you a member of the Screen Writers Guild?

"Mr. Cole. Mr. Chairman, I would like at this time to make a statement (handing statement to the chairman).

"Mr. McDowell. I think it is insulting, myself.

"The Chairman. This statement is clearly another case of vilification and not pertinent at all to the inquiry. Therefore, you will not read the statement.

"Mr. Cole. Well, Mr. Chairman—

"The Chairman. Mr. Stripling, ask the first question.

"Mr. Cole. Mr. Chairman, may I just ask if I do not read my statement. * * *

"The Chairman. You will not ask anything.

"Mr. Cole. Is the New York Times editorial pertinent—the editorial in the Herald Tribune pertinent?

"The Chairman. Go ahead and ask the question.

"Mr. Stripling. Mr. Cole, are you a member of the Screen Writers Guild?

"Mr. Cole. I would like to answer that question and would be very happy to. I believe the reason the question is asked is to help enlighten—

"The Chairman. No, no, no, no, no.

"Mr. Cole. I hear you, Mr. Chairman, I hear you, I am sorry, but * * *

"The Chairman. You will hear some more.

"Mr. Cole. I am trying to make these statements pertinent.

"The Chairman. Answer the question, 'Yes' or 'No'.

"Mr. Cole. I am sorry, sir, but I have to answer the question in my own way.

"The Chairman. It is a very simple question.

"Mr. Cole. What I have to say is a very simple answer.

"The Chairman. Yes, but answer it 'Yes' or 'No'.

"Mr. Cole. It isn't necessarily that simple.

"The Chairman. If you answer it 'Yes' or 'No', then you can make some explanation.

"Mr. Cole. Well, Mr. Chairman, I really must answer it in my own way.

"The Chairman. You decline to answer the question?

"Mr. Cole. Not at all, not at all.

"The Chairman. Did you ask the witness if he was here under subpena?

"Mr. Cole. What is it, Mr. Chairman? I beg your pardon?

"Mr. Stripling. Mr. Cole, you are here under subpena served upon you on September 19, are you not?

"Mr. Cole. Yes, I am.

"Mr. Stripling. And the question before you is: Are you a member of the Screen Writers Guild?

"Mr. Cole. I understand the question, and I think I know how I can answer it to the satisfaction of the committee. I wish I would be permitted to do so.

"The Chairman. Can't you answer the question?

"Mr. Cole. You wouldn't permit me to read my statement and the question is answered in my statement.

"The Chairman. Are you able to answer the question 'Yes' or 'No' or are you unable to answer it 'Yes' or 'No'?

"Mr. Cole. I am not able to answer 'Yes' or 'No'. I am able, and I would like to answer it in my own way. Haven't I the right accorded to me, as it was to Mr. McGuinness and other people who came here?

"The Chairman. First, we want you to answer 'Yes' or 'No', then you can make some explanation of your answer.

"Mr. Cole. I understand what you want, sir. I wish you would understand that I feel I must make an answer in my own way, because what I have to say—

"The Chairman. Then you decline to answer the question?

"Mr. Cole. No, I do not decline to answer the question. On the contrary, I would like very much to answer it; just give me a chance.

"The Chairman. Supposing we gave you a chance to make an explanation, how long would it take you to make that explanation?

"Mr. Cole. Oh, I would say anywhere from a minute to 20, I don't know.

"The Chairman. Twenty?

"Mr. Cole. Sure, I don't know.

"The Chairman. And would it all have to do with the question?

"Mr. Cole. It certainly would.

"The Chairman. Then would you finally answer it 'Yes' or 'No'?

"Mr. Cole. Well, I really don't think that is the question before us now, is it?

"The Chairman. Then go to the next question.

"Mr. Stripling. Mr. Cole, are you now or have you ever been a member of the Communist Party?

"Mr. Cole. I would like to answer that question as well; I would be very happy to. I believe the reason the question is being asked is that because at the present time there is an election in the Screen Writers Guild in Hollywood that for 15 years Mr. McGuinness and others—

"The Chairman. I didn't even know there was an election out there. Go ahead and answer the question. Are you a member of the Communist Party?

"Mr. Cole. If you don't know there is an election there you didn't hear Mr. Lavery's testimony yesterday.

"The Chairman. There were some parts I didn't hear.

"Mr. Cole. I am sorry, but I would like to put it into the record that there is an election there.

"The Chairman. All right, there is an election there. Now, answer the question, Are you a member of the Communist Party?

"Mr. Cole. Can I answer that in my own way, please? May I, please? Can I have the right? Mr. McGuinness was allowed to answer in his own way.

"The Chairman. You are an American, aren't you?

"Mr. Cole. Yes; I certainly am, and it states so in my statement.

"The Chairman. Then you ought to be very proud to answer the question.

"Mr. Cole. I am very proud to answer the question, and I will at times when I feel it is proper.

"The Chairman. It would be very simple to answer.

"Mr. Cole. It is very simple to answer the question—

"The Chairman. You bet.

"Mr. Cole. (continuing). And at times when I feel it is proper I will, but I wish to stand on my rights of association—

"The Chairman. We will determine whether it is proper.

"Mr. Cole. No, sir. I feel I must determine it as well.

"The Chairman. We will determine whether it is proper. You are excused."

(3) The Issues for Determination

The following issues of fact remained for determination:

(A) What were plaintiff's acts, conduct and activities, severally and/or in association or concert with others, in respect of the matters referred to in the notice?

(B) Did plaintiff by his conduct and activities during and in connection with

his said appearance as a witness before the Committee on Un-American Activities shock and offend the community, bring himself into public scorn and contempt, substantially lessen his value as an employee to defendant Loew's Incorporated, prejudice the interests of said employer and/or the motion picture industry generally, and render himself unable to render the kind and quality of services required and contemplated by the contract of employment and/or the employment relationship created thereby?

(C) Did plaintiff by his said conduct and activities injure or prejudice the interests of defendant Loew's Incorporated, or bring about the likelihood or danger of any such injury or prejudice?

(D) Did the act of defendant Loew's Incorporated in delivering and putting into effect the notice marked "Plaintiff's Exhibit 3" cause irreparable injury to plaintiff?

### (4) Instructions to the Jury

### I. The Nature of the Action and the Contract

The action is for declaratory judgment and was instituted by the plaintiff, Lester Cole, who was employed by the defendant, Loew's Incorporated, as a writer for motion pictures.

Certain facts in this case have been stipulated to by the parties to be true. That means that those facts are established without the necessity of introducing any evidence of them and that they must be accepted as facts by you. The facts so stipulated in this case are before you.

The phase of the case with which the jury is concerned, relates to the notice served upon the plaintiff on December 2, 1947, which, omitting the date, title, salutation and signature, reads:

"At a recent hearing of a committee of the House of Representatives, you refused to answer certain questions put to you by such committee.

"By your failure to answer these questions, and by your statements and conduct before the committee and otherwise in connection with the hearings, you have shocked and offended the community, brought yourself into public scorn and contempt, substantially lessened your value to us as an employee, and prejudiced us as your employer and the motion picture industry in general. By so doing, you have violated your obligations under your contract of employment with us dated December 5, 1945, as amended, commencing as of December 3, 1947, and continuing until such time as you are acquitted or have purged yourself of contempt of the Congress of the United States and you declare under oath that you are not a Communist.

"This action is taken by us without prejudice to, and we hereby reserve, any other rights or remedies which we may have."

It is the contention of the plaintiff that the defendant did not have the right to suspend him. This contention is contradicted by the defendant who asserts that it had the right to suspend under the written contract between the plaintiff and the defendant, dated December 5, 1945, and more particularly, under the clause reading as follows: "The employee agrees to conduct himself with due regard to public conventions and morals and agrees that he will not do or commit any act or thing that will tend to degrade him in society or bring him into public hatred, contempt, scorn or ridicule, or that will tend to shock, insult or offend the community or ridicule public morals or decency, or prejudice the producer or the motion picture, theatrical or radio industry in general."

Clause (2) of the contract reads: "(2) The employee agrees that throughout the term hereof, he will write stories, adaptations, continuities, scenarios and dialogue and that he will render such other services in the editorial department of the producer as the producer may request; that when and as requested by the producer he will render his services as a producer and/or associate producer and in such other executive capacity, or capacities, as the producer may require and as the employee may be capable of performing; that he will promptly and faithfully comply with all reasonable instructions, directions, requests, rules and regulations made or is-

sued by the producer in connection herewith; and that he will perform and render his services hereunder conscientiously and to the full limit of his ability and as instructed by the producer at all times and wherever required or desired by the producer. The term "photoplays" as used in this agreement shall be deemed to include, but not be limited to, motion picture productions produced and/or exhibited and/or transmitted with sound and voice recording, reproducing and/or transmitting devices, television, radion devices and all other improvements and devices which are now or hereafter may be used in connection with the production and/or exhibition and/or transmission of any present or future kind of motion picture productions."

The clause in the contract under which the notice of suspension was given defines certain conduct. The words used in the clause, some of which are carried over into the notice, are ordinary English words with the meaning of which you are familiar. Some of them however, should be further defined.

To "shock" means to offend the sensibilities of someone; to strike with surprise, terror, horror or disgust.

To "offend" is to cause dislike or anger.

"Scorn" means the object of extreme disdain, contempt, or derision.

"Contempt" is the act of contemning or despising; the feeling with which one regards that which is considered mean, vile or worthless.

"Disdain, scorn" would also express the state of being despised, disgraced, shamed.

These words together, when applied to the conduct of a person, describe conduct which reflects on the character of a person and his name and standing in the community and tends to expose him to public hatred, contempt, scorn or ridicule, or which would shock, insult or offend the community.

The conduct must be such that a noticeable part of the community or a class of society whose standard of opinion we recognize, would be made to despise, scorn or be contemptuous of the person who is charged with such conduct.

In answering the special interrogatories which will be submitted to you, you must determine as to each whether the conduct of the plaintiff in the particular instance referred to,—namely, his appearance before the Congressional Committee—was of such character that you, as jurors, can say that, under our American standards of right conduct, it did shock or tend to shock and offend the community and/or brought the plaintiff or tended to bring the plaintiff into public scorn, hatred and contempt as herein defined.

The verb "to prejudice" also appears in the clause of the contract by which the plaintiff agrees, among other things, not to do or commit any act or thing that will "prejudice the producer or the motion picture, theatrical or radio industry in general".

The verb "to prejudice" is defined as follows: "To injure or damage by some judgment or action; to cause injury to; hence, generally, to hurt; damage; injure; impair, as to prejudice".

In respect to this word also, you must determine whether the conduct of the plaintiff was such that you, as jurors, can say that, under our American standards of right conduct, which are accepted by the community of which you are a part, it was conduct which would injure or damage the defendant. And, in determining whether it would have such effect, you must consider whether the conduct would be considered an attack or reflection on the reputation of the defendant in its method of conducting its affairs through the employment as a writer of a person who acts as the plaintiff did under the circumstances.

Even lawful actions may shock or offend certain persons and subject the persons performing these acts to scorn and contempt. To illustrate: If a man is sued for money owed, he may even though he has not paid the money, defend the action on the ground that it was outlawed, that is, that the suit was not brought within a certain period of time prescribed by law. A person holding high views of business or commercial ethics might be critical of one who makes such a defense. But it could not be said that the community as

a whole, or a good portion of it, would be shocked or offended by the fact or that it would subject the person making such defense permitted by law to public scorn or contempt.

■ Unless forbidden by State or Federal law, or by the courts as against public policy, an employer might, as a condition of employment, require in a written contract, that an employee do not perform, during the course of the employment, certain acts which are not in themselves illegal. In such event, the employer might, if the employee violated the condition, during the period and time of employment, consider it a breach and take whatever steps he may be allowed under the contract.

And in a lawsuit arising from such a controversy, the only factual situation involved would be whether the designated prohibited act was actually committed. But when, as here, the prohibited conduct is not named specifically in the contract of employment, but is defined as conduct having a certain effect, then the jury is called upon to determine, as you are called upon here, as questions of fact:

(1) Whether the conduct was of the character forbidden by the contract; and

(2) Whether the employee was guilty of such conduct.

You are instructed that the burden is on the defendant to prove by a preponderance of the evidence sufficient justification, in accordance with the instructions of the court, for suspending Mr. Cole. This means that before you can find that the defendant was so justified or that plaintiff conducted himself in a manner contrary to the morals clause of the contract, you must be satisfied by a preponderance of the evidence that every fact essential to show such justification is true.

Therefore, unless such justification is established by a preponderance of the evidence you must find that the plaintiff did not conduct himself in such a manner as to bring himself into public scorn, hatred, contempt or ridicule, or that his conduct had any of the other effects in the clause.

In considering whether Lester Cole's conduct had such effect, you are not to speculate or to guess. If you are not satisfied by a preponderance of the evidence that such was the fact, you are to find that his conduct did not have any of the effects stated in the clause.

In determining whether the conduct of Lester Cole had such effect, or if it had any, you are to consider only the period between October 30, 1947, and December 2, 1947.

■ An employer cannot penalize an employee simply by claiming a violation of a contract by the employee. In order to justify a claim of violation and a suspension or other penalty allowed by the contract, the employer must show that the employee's act charged as violation was done or committed by the employee and that it was done wilfully and intentionally. Thus, in order to find that the plaintiff so conducted himself as to bring himself into public scorn, hatred, contempt or ridicule, or to shock the community or prejudice the defendant, you must find from all the evidence, and by a preponderance of the evidence, that his conduct, which it is charged had that effect, was wilful and intentional and actually had that effect.

A "willful" act is an intentional act. It does not necessarily imply any evil intent on the part of an employee or malice on his part. It does not necessarily imply anything blamable, or any ill-will or wrong toward the other party, or perverseness or moral delinquency, but merely that the thing done or omitted to be done was done or omitted intentionally. It amounts to nothing more than this: that the person knows what he is doing, intends to do what he is doing and is a free agent when he does it.

## II. The Law of Contracts Between Master and Servant or Employer and Employee

■ You are instructed that where an employment is under a written contract for a definite period which defines the rights and obligations of both parties, the conditions of the contract are binding upon both parties. This means that the contract is the sole measure by which the conditions relating to its existence, continuance and termination of the relation of employer and employee are gauged. And

any question relating to performance or non-performance by either party to the contract must be determined by the terms of the contract.

The courts, in interpreting and enforcing contracts of employment, have, however, laid down certain rules pertaining to the mutual obligations of the parties in the performance of the contract.

■ One of the principles is that an agent or employee is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency or employment.

■ However, unless the contract of employment specifically otherwise provides, an employee is not necessarily prevented from acting in good faith outside his employment in a manner which might injuriously affect his master's or employer's business.

■ An employer may consider a contract of employment breached by the employee when the employee fails to perform his duty under it or breaches the express or implied conditions in the contract, even though injury does not result to the employer in consequence of the employee's breach. But the reason given for the action must be true, from the standpoint of the employer acting in good faith.

■ And where the contract specified the grounds for its termination or suspension, and written notice of such ground is provided for, the employer, in order to justify his action, must show that the ground given in the notice actually existed. If he does not do so, by a preponderance of the evidence, he cannot justify his action upon other grounds named in the contract which, although true, were not stated in the notice.

In performing his duties under the contract, the plaintiff was required to comply substantially with its terms.

To apply these rules to the facts here: The plaintiff Lester Cole was employed by the defendant, Loew's Incorporated, under a written contract of employment; that contract ran until November 15, 1949, with certain options. Where, as here, an employer suspends an employee during the term of his contract, the law requires that the employer justify that suspension by a preponderance of the evidence. In this case, the defendant having notified the plaintiff that it suspended the plaintiff upon the ground that he so conducted himself at this hearing and in connection with it as to bring himself into public scorn, hatred, contempt or ridicule, it is necessary for the defendant to prove by a preponderance of the evidence that the plaintiff Lester Cole personally so conducted himself that he was held in public scorn, hatred, contempt or ridicule, or that his conduct shocked or offended the community or prejudiced the defendant or the industry in general.

### III. The Acts of the Employer Considered as Waiver

■ An employee has a right to rely on statements of the officers and representatives of a corporation by which he is employed in determining whether a certain course of conduct would violate his obligations as an employee.

■ If an employer by his words and acts leads an employee to believe that certain conduct by the employee will not be considered a violation of his employment obligations, and the employee, in good faith, acts in such belief, then the employer may not thereafter be allowed to treat such conduct as a breach of the employee's obligations.

If Mr. Cole, in good faith, in this case did come to the conclusion, from the actions and the statements of the executives of the defendant, Mr. Mayer and Mr. Mannix, and you so find as a fact, that Mr. Cole could conduct himself as he thought proper before the congressional committee, assuming that you find such actions took place and such statements were made, you are instructed that Cole had the right to use his best judgment as to what his conduct before the Committee should be.

Or, to put it differently and more explicitly:

If you find that the defendant's executives, Mr. Mayer and Mr. Mannix, performed certain acts and made certain statements, and by such actions and such state-

ments, before the hearings, led the plaintiff Lester Cole to believe that they were not concerned about charges that he was a Communist, or that he was a Communist —and Mr. Cole, in good faith, relied on such statements and actions in deciding upon a line of conduct before the Committee —but that the defendant's executives afterwards changed their minds, without notifying Cole, before he testified before the House Committee, and without giving him any specific instructions as to how to act, then I instruct you that Cole had the right to pursue the conduct he had decided upon on the basis of the prior acts and statements referred to, if you find them to be true and to have existed, without regard to any later claim or possible claim by his employer that, because of his conduct, the public might be led to believe that he was a Communist.

In this case, the plaintiff Lester Cole agreed in his contract with Loew's Incorporated that he would comply with the provisions of his contract to the full limit of his ability or as instructed.

If you find that the defendant Loew's Incorporated knew that Lester Cole had been subpoenaed to appear before the House Committee on Un-American Activities, then I instruct you that if the defendant Loew's desired that plaintiff Lester Cole conduct himself before the Committee in a certain manner, the defendant Loew's had a right to give reasonable and specific instructions to Lester Cole and that it was his duty to follow them, if they were reasonable, as the contract provides.

You are instructed that even if an employer has the right to suspend an employee under a contract, he may, by his words or conduct, and without reference to any act or conduct of the party affected thereby, waive this right. A waiver is such conduct of the employer as shows his election to forego the right to suspend, which he might otherwise have taken or insisted upon under the contract. Once such right is waived by the employer, it is gone, so far as the particular conduct is concerned, and cannot be claimed by him, except for some other or different violation by the employee.

To put it into a brief sentence: An employer knowing of an employee's conduct which might warrant suspension or termination of employment may not continue employing him thereafter and at a later date treat the employee's conduct as a breach of his obligations.

So, here, if you find that when Cole came back from Washington, Loew's knew of Cole's statements and conduct before the House Committee in Washington in connection with the particular hearings, but, nevertheless, put him back to work, and accepted his services with the intention of accepting Cole as its employee under the employment contract, then I instruct you that Loew's waived the right to rely upon such conduct in taking action against Cole.

## IV. The Rights of Witnesses before Committees

You are instructed that you are not concerned with the legality of the existence of the Un-American Activities Committee of the Congress of the United States. You are to assume that it was legally constituted and I instruct you that it was so legally constituted. Nor is the Committee's right to inquire into certain matters before you. You must assume that the right to do so exists, and I so instruct you.

The right of Congressional inquiry through committees is a necessary and legal adjunct to the American democratic process, and fruitful recommendations and legislation have, at times, resulted from such inquiries.

In exercising the right of inquiry, a Congressional committee may subpoena witnesses and ask them questions relevant to the inquiry. However, a witness examined before the committee also has rights. He may decline to answer certain questions in order to secure from the courts a final determination of the right of the committee to ask the particular question. When he does so, he paves the way for contempt proceedings in the courts, and not before the committee, where, that is, in the courts, a final decision as to the power of the committee in the particular respect can be obtained.

■ When a question is asked of a witness before a committee, he may give either a direct or an irresponsive answer. If the question is of such character as to require an explicit answer, he may be directed to give such answer. But he cannot be required to answer in a specific manner and without being given an opportunity to explain his answer. Nor can he be denied the right to amplify it. And there is nothing wrong if the answer which the witness gives goes beyond the question, or is what we call in law non-responsive.

■ A non-responsive answer, if it includes irrelevant matter, may be stricken. If it contains relevant facts, they are admissible, notwithstanding the fact that they were not specifically asked for or called for by the particular question.

■ When a witness is called before a Congressional committee, he has a right to invoke the protection of the Constitution and of the laws of the United States, and to that end he has the legal right guaranteed to every citizen or legal resident of the United States to assert rights reserved by the Constitution and the law and to claim their privileges.

In this respect, the Supreme Court has said:

"An official inquisition to compel disclosures of fact is not an end, but a means to an end; and it is a mere truism to say that the end must be a legitimate one to justify the means. The citizen, when interrogated about his private affairs, has a right before answering to know why the inquiry is made; and if the purpose disclosed is not a legitimate one, he may not be compelled to answer." Jones v. Securities & Exchange Commission, 1935, 298 U.S. 1, 25, 56 S.Ct. 654, 662, 80 L.Ed. 1015.

And, before a witness can be guilty of contempt of a legislative committee, two conditions must concur:

(1) The questions asked of the witness must be relevant to the purpose of the inquiry, that is, it must be required in a matter into which the committee has the jurisdiction to inquire, and

(2) The witness must actually refuse to answer the relevant question.

Or, conversely put:

"A witness rightfully may refuse to answer where the bounds of the power are exceeded or the questions are not pertinent to the matter under inquiry."

Whether he is right or wrong, and even though he may be subjected to penalties if he is wrong, every citizen has the right to have determined by the courts questions as to his Constitutional or other legal rights. This is one of the privileges and incidences of American citizenship.

And even the alien in our midst, if he be a legal resident, has certain rights and privileges which he may assert and which it is the duty of a legislative committee to respect and of the courts to protect.

## V. Some Further Instructions as to the Respective Rights of Employer and Employee

■ No employer has the right to coerce or influence any of his employees to follow any particular course or line of political action or political activity. However, parties to an employment contract may agree not to engage in certain particular activities at certain definite times. To illustrate: A man has the right to run for political office. But a contract of employment may prohibit an employee from running for office or campaigning for office on the employer's time.

The word "political" is defined as follows: "Of or pertaining to the exercise of the rights and privileges or the influence by which the individuals of a state seek to determine or control its public policy; having to do with the organization or action of individuals, parties, or interests that seek to control the appointment or action of those who manage the affairs of state."

"Politics" is defined as follows: "The science and art of government; the science dealing with the organization, regulation, and administration of a State, in both its internal and external affairs; political science. * * * The theory or practice of managing or directing the affairs of public policy or of political parties; hence, political affairs, principles, convictions, opinions, sympathies, or the like * * *".

## VI. The Question of Communism

In view of the fact that the conduct of the plaintiff which is made the ground of suspension involved his failure to answer concerning his membership in a professional union and in the Communist party, the court will give you some specific instructions as to the bearing of the question on the problem before you.

 You are instructed that in California it is libelous to call a person a Communist. This for the reason that such a charge would expose a person to the hatred, contempt and ridicule of many persons.

At the same time, I instruct you that in California it is lawful for a person to be a member of the Communist Party, and to register with the Registrar of Voters of a County as a member of such party. In California, the Communist Party is entitled to participate in elections, including primary elections, and to nominate candidates. And, while, under California law, any party which carries on or advocates the overthrow of the government by unlawful means or which carries on or advocates a program of sabotage may not participate in primary elections, the courts of California have ruled that the courts do not take judicial notice of the fact that the Communist Party advocates the overthrow of the government by force or violence, and they have also ruled that a registered Communist is not guilty of a violation of the State law by the mere fact of membership in the Communist Party. You are to bear these facts in mind in judging whether the conduct of the plaintiff was as charged by the defendant. And, in determining this matter, you are to bear in mind the following facts and additional instructions.

 I have stated that in California an accusation of Communism against a person is libelous. This is so because, under California law, every false and unprivileged publication which exposes a person to hatred, contempt, ridicule or obloquy or causes him to be shunned or avoided, or which has a tendency to injure him in his occupations, is libelous per se.

The law recognizes in every man a right to have the estimation in which he stands in the opinion of others unaffected by false statements to his discredit.

In this manner, the law recognizes that men's reputations are "tender things", and presumes that every person has a good reputation.

 For this reason, the law does not require one who has been libelled to prove its falsity. On the contrary, falsity is presumed if the publication is unprivileged,—that is, not uttered in a judicial or legislative proceeding or other proceedings protected by law, and is of a character to affect his reputation, such as a charge of Communism is.

The person who libels another has the burden of proving that the charge is true. He who repeats a libelous statement, if he wishes to justify it, must prove not that another has made the statement, but that the statement is true.

These principles should be borne in mind by you in considering the testimony in this case in which reference was made to certain accusations made against the plaintiff in certain publications and before the Committee which were repeated and discussed in the presence of some of the defendant's representatives. You were admonished at the time when these accusations were repeated here and I admonish you again now that they are to be considered only as having been made and that no one has proved in this lawsuit that these accusations are true. Indeed, the truth of these accusations is not an issue in the case. And the reason, as already stated, is that the defendant has not charged the plaintiff is a Communist or a member of the Communist Party and that the notice of suspension involved here does not set forth as a ground of suspension the fact, if it be a fact, that the plaintiff is or ever has been or was at the time of the notice, a Communist or a member of the Communist Party. As you have already been instructed, the defendant, having, in accordance with the contract of employment, specified in the notice the ground on which they relied for suspension, is bound by it. And the only ground of suspension set forth in the notice is the conduct of the plaintiff before the Un-American Activities

Committee of the Congress in connection with certain hearings and at the time specified of his appearance before that Committee. All the evidence on the part of both the plaintiff and the defendant has been directed to that conduct. And the question whether the plaintiff is or is not, was or was not, a Communist, is not before you. All you have to determine is whether in not answering in the manner requested by the Committee, the question among others, whether he was a Communist or a member of a trade organization, and whether his entire conduct before the Committee in connection with the hearings was of the type forbidden by what has been called the "public relations" clause as bringing the plaintiff into public scorn and contempt, shocking and offending the community and prejudicing the defendant and the industry.

And, in determining this matter, you are to consider all the evidence and reach your verdict without trying to speculate about the political affiliations of any of the witnesses or parties in this case.

* * *

The Jury returned a special verdict on December 17, 1948, the form of which appears in Note 1 of the Opinion which follows.

Because only the court can render a declaratory judgment, and the added equity features of the case, further proceedings were had before the court on December 20, 1948. No additional evidence, other than that introduced before the jury, was received, but arguments as to the scope of the relief to be granted were presented by counsel for both sides. At the conclusion of the hearing, the Court rendered the opinion which follows.

* * *

In releasing the opinion for publication, Judge Yankwich accompanied it by the following statement summing up the issues in the case:

*"There seems to have been some misunderstanding about the purport of the decision I made after the verdict of the jury. So it is well to say that I made no decision as to the policy of employing communists or persons accused of communism in private industry. Neither problem was before the jury or before me. What we were called upon to decide and did decide was that a general policy advocated by Mr. Eric Johnston long before Lester Cole's appearance before the Committee, was used as an excuse to break a contract for conduct which the employer, MGM, did not consider, either before or after it took place, as being in violation of any obligation of Cole as an employee. In brief, as I said in open court, the jury and I upheld the binding character in American law of the pledged written word."*

Other facts appear in the opinion, and Notes and the Findings and Exhibits which are printed after it.

* * *

Kenny & Cohn, Robert W. Kenny, Charles J. Katz, Gallagher, Margolis, McTernan & Tyre, Ben Margolis and William B. Murrish, all of Los Angeles, Cal., for plaintiff.

Loeb & Loeb, Herman Selvin, Milton A. Rudin and Irving M. Walker, all of Los Angeles, Cal., for defendant.

## Opinion.

YANKWICH, District Judge (after stating the facts as above).

The Court will adopt, as his own, the findings of the jury returned on the special verdict contained in the answers to the four questions propounded, and, on the basis of those answers and the findings which are implicit in the answers[1], the Court will

---

[1] The questions and answers were:

"(1) Did the plaintiff Lester Cole, by his statements and conduct before the House Committee on Un-American Activities, in connection with the hearing held by said Committee, bring himself or tend to bring himself into public hatred, contempt, scorn or ridicule?

"Answer: No.

"(2) Did the plaintiff Lester Cole, by his statements and conduct before the House Committee on Un-American Activities, in connection with the hearing held by said Committee, tend to shock, insult or offend the community?

"Answer: No.

"(3) Did the plaintiff Lester Cole, by his statements and conduct before the House Committee on Un-American Activities in connection with the hearing

make the following findings and declarations:

## I. The Jury's Verdict and its Implications.

■ The Court finds that the notice of December 2, 1947, given by Loew's Incorporated, suspending the employment of the plaintiff, Lester Cole, for the reasons therein indicated, is null and void; that the ground therein stated,—the appearance before the Committee,—was not a valid ground for the order of suspension; that the action of the plaintiff, when appearing before the Committee, and his entire conduct with relation to the hearings, before, at, or about the time of the hearings,—were within his rights and did not constitute a breach, on his part, of Clause 5 of the contract,—which has been designated as the "public relations" or "morality" clause [2], or any other portion of the contract; that it was not a ground either for suspension or for termination of the contract; that no other ground was stated in the notice and none has been shown to exist.

I find that, at that time, no ground existed for the suspension, or for the temporary or permanent termination of the contract between the plaintiff and the defendant.

I find that plaintiff is entitled to receive from the defendant the salary which has not been paid to him since the notice of suspension, at the rate of $1,350.00 per week, to the present time and until his reinstatement.

I find that the notice of suspension was a breach on the part of the defendant of its obligations under the contract and a violation of the rights of the plaintiff under it.

The defendant is ordered to reinstate the plaintiff, failing which, it is to continue to pay to him the weekly compensation under the contract.

The Court will retain jurisdiction for the purpose of entertaining any further proceedings in regard to the future actions of the parties, so that if the defendant should not reinstate him, the plaintiff need not resort to another action in order to recover compensation not yet earned, and which may become due, but may come into court without supplemental action, and have judgment for such additional sums as may become due in the future, either because of refusal of reinstatement or pending appeal.

Injunction will issue preventing the defendant from continuing in effect the notice of suspension, and requiring them to enter a resolution upon the Minutes of the Board of Directors cancelling the effect of it and declaring the suspension at an end.

## II. The Grounds of Agreement.

■ I now indicate that I adopt the findings of the jury, not because I feel bound to (as to which there may be a question), but because I am in entire agreement with the conclusions they reached. Differently put, I am convinced that the conduct of the plaintiff in this case, which was made the basis of the notice, was not conduct which had any of the effects claimed by the notice. As a fact, there is doubt in my mind whether the suspension clause applied to a situation such as this.[3] During the early stages of the case, I intimated that it might be argued that this clause,—the clause which allowed suspension for inability or refusal to

held by said Committee, prejudice the defendant Loew's Incorporated as his employer or the motion picture industry generally?

"Answer: No.

"(4) Did the defendant Loew's Incorporated by its conduct towards the plaintiff, subsequent to the hearing, waive the right to take action against him by suspending him?

"Answer: No."

[2] The clause reads: "5. The employee agrees to conduct himself with due regard to public conventions and morals, and agrees that he will not do or commit any act or thing that will tend to

degrade him in society or bring him into public hatred, contempt, scorn or ridicule, or that will tend to shock, insult or offend the community or ridicule public morals or decency, or prejudice the producer or the motion picture, theatrical or radio industry in general."

[3] The wording of this provision was: "In the event of the failure, refusal or neglect of the employee to perform his required services or observe any of his obligations hereunder to the full limit of his ability or as instructed, the producer, at its option, shall have the right to cancel and terminate this employment, may refuse to pay the employee any com-

perform,—referred to acts other than those provided for in the "morality" clause. The "morality" clause enjoins certain specific conduct, defining it by effect.

The suspension clause,—as I read it,—lends itself to the interpretation that what they had in mind was some temperamental idiosyncrasy of a writer which, in the midst of the making of a motion picture, would cause him to "go on a party" and not be on the job, or who would have a tantrum and decline to make changes in a script by reason of pride of authorship, and thereby hold up production, or other like conduct. Otherwise put, the suspension clause contemplated situations incidental to the performance by the writer of certain specific acts, which would not amount to a breach of contract, or were of such character that it would be unfair to the employer to be put to the choice of terminating it. So there was inserted the provision to the effect that if the writer failed to do certain things, he might be *suspended (temporarily)* without pay. But at the present time, this has become an abstract proposition. For I now adopt the view that the facts set forth in the notice, *if true,* and *if they had the effect claimed for them,* would have justified suspension. And I state that I am in complete agreement with the finding of the jury that the conduct did not have the effect contemplated by the "morality" clause and that the conduct of the defendant towards the plaintiff, subsequent to the occurrence,—and at a time when their officers knew all that had taken place, *(because the executive head of the studio, Mr. Louis B. Mayer, was at the hearing and heard and knew everything that had taken place),*—in returning the plaintiff to work and having him work on a play, "Zapata", having him keep himself available and paying him a salary,—conduct which continued for a period of several weeks,—was a condonation and waiver. Just as in the Goudal-DeMille case, continuing the actress Jetta Goudal in the performance of her work until the picture was completed, was considered by the higher courts a waiver, as I had held it to be on the trial of the case.[4]

To my mind, it is inconceivable that any other conclusion could have been arrived at, after Mr. Louis B. Mayer, the executive head of the studio, had completed his testimony. I think that the plaintiff owes a debt of gratitude to Mr. Mayer for the forthrightness with which he testified. When he had finished, it was quite evident that, so far as MGM,—the production branch of the defendant,—was concerned, and so far as the men actually in charge of production were concerned, they did not consider Cole's conduct a violation, on his part, of any of his obligations under the contract.

I think that Mr. Mayer won the case for the plaintiff, even before Mr. Cole took the stand. And I pay my respects to Mr. Mayer for not only giving a straight-forward and truthful statement of the occurrences, but for allowing the jury to draw the only inference that could be drawn,—and that is, *—that even after his appearance before the*

---

pensation for and during the period of such failure, refusal or neglect on the part of the employee, and shall likewise have the right to extend the term of this agreement and all of its provisions for a period equivalent to all or any part of the period during which such failure, refusal or neglect continues. If at the time of such failure, refusal or neglect, the employee shall have been instructed to render any of his required services hereunder, the producer shall have the right to refuse to pay the employee any compensation for and during the time which would have been reasonably required to complete such services, or (should another person be engaged or instructed to perform such services) until the completion of such services by such other person, and in any or either of such events the producer shall also have the right to extend the term of this agreement and all of its provisions for a like period of time or for any portion thereof."

Despite the protection which the power to suspend gave to the employer, the employee was forbidden to seek employment elsewhere in a clause which reads: "During the period of any such suspension, refusal to pay or leave of absence the employee shall not have the right to render his services to or for any person, firm or corporation other than the producer without the written consent of the producer first had and obtained."

[4] Goudal v. Cecil B. DeMille Pictures Corp., 1931, 118 Cal.App. 407, 5 P.2d 432, 7 P.2d 174.

*Committee, nobody thought Cole had done anything to violate the "morality" clause, or any other obligation under the contract.*

Had the defendant thought otherwise, it is inconceivable to me that a man of the long experience of Mr. Mayer,—(the "head" of the studio, as he designated himself at the trial),—would not have called to Mr. Cole's attention the "morality" clause in that "heart-to-heart" talk which they had on the train when returning from Washington. I add that there was very little difference between the version of this talk given by Mr. Cole and that given by Mr. Mayer. In fact, there was only one instance in which there was variance: Mr. Mayer was not certain whether, in speaking of the "shabby treatment",—as he called it,—that he had received at the hands of the Committee, he also included some observation about the bad treatment which Mr. Cole had received, and said that "he did not like it and felt quite upset about it". Mr. Mayer *did not remember* making any such observation, although he recalled saying that he resented the cavalier manner in which he was "brushed aside" by the Committee and was allowed to stand up without being excused, while another person was making a statement.

Mr. Mayer also set the pattern for this case in another respect: *that the most important characteristic of American business relationships is faithfulness to the pledged word. This means that a contract is a contract and cannot be set aside,* except upon grounds that *actually exist* at the time action is taken. Mr. Mayer told the jury that, when he heard that an oral promise had been made to Mr. Cole that his contract would be improved, he insisted that the Company comply with the promise, although he knew that it was not in writing, and that a written agreement could only be modified by another agreement in writing.

### III. The Policy Behind the Notice.

One other matter is quite apparent,— namely, that MGM,—*the producing arm of the defendant,*—at no time, *desired* to take this action, that MGM, at no time, thought that the conduct of Mr. Cole gave them any *excuse or warrant* for suspending his employment or terminating it. They did not agree to the "statement of policy", except reluctantly; and, even then, that they did not think that the newly-adopted policy gave them the right to terminate this particular contract. For, as already stated, no mention was made of it in the subsequent conversation between Cole and Mayer. And, certainly, their conduct showed that they did not act on it until some one gave the opinion that the "morality" clause was a valid ground for suspension, in order to comply with the new declaration of policy. *The policy adopted was not the policy which MGM wished to adopt.* It was the policy which Mr. Eric Johnston, President of the Motion Picture Association of America, had sought to have adopted at a meeting in July, 1947, and in which he was not successful. The testimony showed that at the meeting in July, 1947, Mr. Johnston presented a three-point program, and that they did adopt the program, *but not point 2, requiring that persons who were charged with, or suspected of, Communism should be discharged by the motion picture industry.* Mr. Mayer, at that time, declared his opposition. He repeated his opposition as did Mr. E. J. Mannix, another executive, when the agents or investigators of the Congressional Committee on Un-American Activities insisted that certain writers,—naming Cole by name,— should be discharged. Mr. Mannix, as his testimony showed, used some very strong words in rejecting the suggestion. Mr. Mayer admitted that, while he did not use the language attributed to him by Mr. Mannix, he had expressed the same view.

So that we find this situation: that Mr. Eric Johnston sought, early in July, 1947, the adoption of a policy which would conform to the demand that this legislative committee had made upon a private employer to discharge an employee bound to them by contract. He failed in that. At the time when this was attempted, no one had appeared before any body or group; no one had brought himself publicly into contempt,—in defiance of the "morality" clause,—least of all, Mr. Cole. The Committee had already decided that they would force the industry to discharge certain men whom they considered suspect. Mr. Mayer said that he was not going to do that, that

there was nothing subversive in any script which Mr. Cole had written, and that, so far as he was concerned, Mr. Cole's employment would continue. And Mr. Mannix concurred in this in less elegant language. Nothing was done. And then we find that Cole's prospective appearance before the Committee was discussed. *At no time were any instructions given to him. There was no intimation to him as to how he was to act.* His employers knew that he had been subpoenaed. They knew that he had voluntarily accepted service of the subpoena in the barber shop of the studio, but, at no time, did they tell him, "You had better be careful about what you say or do. You know we are dealing with a sensitive public." He went to Washington and used his own judgment. In summary, the rationalization which Mr. Eric, Johnston later brought to the matter was an afterthought which never existed in the minds of the executive directors of Loew's Incorporated.

 There is no need to refer to Mr. Johnston's testimony in detail. He did not alter the complexion of the case. I am giving these reasons, in order that counsel will understand that I am not merely making the findings of the jury my own. For I do not concede that I am bound to adopt them *in toto.* Of course, if I felt that the jury was unjustified in its conclusions upon the questions submitted to them, I would not wait until a motion for a new trial was made. On the contrary, under broad powers of the declaratory judgment statute [5], I would set aside their findings now.

To me it is evident, as the testimony of the witnesses in the case who were at the meeting and Mr. Johnston's own testimony indicated clearly, that it was his insistence, his high pressure methods which resulted in the adoption of this policy. When he gave his testimony, I was rather surprised that a man, who was in the employ of the Association, should have spoken so contemptuously of the actions of the New York Committee. He testified that they were not getting anywhere; that there was too much argument. And he finally said that he was "sick and tired" of dealing with persons who were so vacillating,— tired of their recalcitrance. Evidently he felt it was his duty to express his disdain at their vacillation.[6] *Even after that, the final assent was given reluctantly.*

---

[5] 28 U.S.C.A. § 2201, 2202; California Code of Civil Procedure, Secs. 1060, 1061. See, Yankwich, Declaratory Judgment under the New Rules of Civil Procedure, 1940, 1 F.R.D. 294 et seq.

[6] His own version of his reaction to the opposition of some of the members of the Association, including the two executives of the defendant (Mayer and Mannix) at the New York meeting is very revealing and warrants the inferences drawn:

"And, finally, a resolution was prepared that seemingly all present could agree to. Then Mr. Mannix spoke up and said that he didn't know whether this should be done or not because of the California labor laws, which might mean within the State of California that maybe this couldn't be done. Mr. Byrnes, our counsel, then spoke up and said that he had examined the California State Labor Laws and that, in his opinion, this was in no way a violation of the State Labor Laws of California. Mr. Russell, his assistant, also spoke on the same subject and I believe one or two of the other legal counsel present, who came from California, also spoke up to the same tenor. Then Mr. Goldwyn objected and said that he felt they shouldn't go ahead with it. I then arose and said that, in my opinion, these men would have to make up their minds—I think I used the expression 'they would have to fish or cut bait'—that I was sick and tired of presiding over a meeting where there was so much vacillation; but I had no authority to do anything; that I wasn't like the czar of baseball who discharged people if their conduct wasn't satisfactory and seemingly had that authority; but I had no such authority; that either they must adopt one or two of these other alternatives, in my opinion, continue to employ men who were supposedly Communists and justify that employment in the eyes of the American public or they would have the other alternative and not employ them. But for goodness' sake, to make up their minds one way or another. There was some discussion took place after that and finally it was agreed they would adopt this resolution, which was finally adopted. And the specific question was asked by me of Mr. Donald Nelson, who was a representative of the Society of Independent Producers, of which he was their president at that time, whether he agreed to this. He said he did. And I believe one gentleman asked Mr. Goldwyn if he agreed to it and I think someone asked Mr. Wanger if he

*So we find that the notice of suspension does not contain or designate, in the language of the cases, a ground which, from the standpoint of the master, acting in good faith, is true.*[7]

## IV. No Real Ground for Suspension.

On the contrary, we are confronted with a ground which did not exist at any time from July, 1947, until October 3 of the same year, even "as a twinkle in the eye" of MGM, as a possible ground for discharge. It was brought in, for the first time, by the resolution offered by Mr. Johnston,—which he had first proposed in July 1947.

In brief, Mr. Johnston, in July, 1947, had determined to accede to the request of the Un-American Activities Committee that certain persons, whom they considered suspect,—among them, Cole,—should be discharged. He sought to achieve this by the statement of policy No. 2. He did not succeed. And then, when the hearings were held, he came back to it, and, in his dogmatic, doctrinarian manner, decided that the conduct of Cole and others warranted acceding to the request. If I were to use expressions from philosophy, I would say that Mr. Mayer exhibited pragmatism, while Mr. Johnston was dogmatic, doctrinaire and absolutist. In my view, Mr. Mayer, in this instance, typified the better type of business executive, who believes in living and letting live. He believes that, so long as an employee complies with his contract, he is not going to tell him what to say or do, and that, regardless of what private opinions he may have, if he did not try to instill them into the motion pictures, it was not,—so far as he (Mayer) was concerned,—a ground for suspending or terminating the contract. And Mr. Mannix put the matter very emphatically when he said that Mr. Cole could not possibly insert any subversive matter into motion pictures. He challenged the investigators of the Committee to show him any such matter. To put it differently, Mr. Mayer and Mr. Mannix took the view that, if a person had a rake in his employ, he would not discharge him so long as he kept away from the employer's daughters and other members of his family. Mr. Johnston, on the contrary, is what is called in philosophy an absolutist. He does not believe that life is what is designated in painting as *chiaroscuro*—a mixture of light and shade. He believes that life is what Cotton Mather or Timothy Dwight thought it was,—that the mere accusation that certain men were Communists was sufficient to warrant the termination of their employment. He was not concerned with the binding character of contract,—which the common law has respected,—a policy which is embodied in our Constitution in the mandate that a person shall not be deprived of life, liberty or property without due process of law[8]; or with the fact that a contract is property.

did, and they said they did and they would go along.

"The Court: Did Mr. Mannix finally agree to it? A. Mr. Mannix went along; yes. And I think with that the meeting adjourned for lunch, and we had lunch the second day. At that lunch we discussed means and methods of implementing this agreement by working with the Guilds in Hollywood; to elicit their help and cooperation. I mentioned that in previous testimony before the House Un-American Activities Committee I said that I felt that management and labor were responsible for cleaning their house of Communists; that that was a job for management and labor working together; that I personally believed that a Communist was a foreign agent and subversive, and that I personally wouldn't employ a Communist, a known Communist, because he was, in my opinion, a foreign agent, working for a foreign government. I said I felt it was up to management and labor to work together as closely as they could on this problem; that this was one of the things in which I felt that management and labor had a mutual responsibility to help solve. I think shortly after that the meeting adjourned and each went to their respective places."

[7] May v. New York Motion Picture Corp., 1920, 45 Cal.App. 396, 402–404, 187 P. 785; Ehlers v. Langley & Michaels Co., 1925, 72 Cal.App. 214, 221, 237 P. 55; Kiker v. Bank Sav. Life Ins. Co., 1933, 37 N.M. 346, 23 P.2d 366, 368; 56 C.J.S., Master and Servant, §§ 41–44. As to what amounts to waiver, see, Goold v. Singh, 1928, 88 Cal.App. 339, 343, 263 P. 548; Moresco v. Foppiano, 1936, 7 Cal.2d 242, 245, 60 P.2d 430.

[8] United States Constitution, Amendments V and XIV.

So believing,—although envisaging the possibility that legal difficulty might be encountered,—he was willing to "brush aside" the contractual obligations of this defendant. What he wished to achieve was a dogmatic declaration of policy, which left MGM to shift for itself in seeking a legal excuse for breaking the contract.[9] In effect, the plaintiff was made to suffer the penalty of suspension, *not* for an act which his employer considered to be a breach of contract, but for the dogmatic attitude on the part of an executive of the motion picture association, which his employer had assented to *unwillingly*.

And the upshot of the whole matter is this: We are confronted with a condition which was brought about by Mr. Johnston's conviction that, *regardless of contract,* men who profess certain heterodox ideas should be immediately discharged, as requested by the investigators of a congressional committee,—a policy which he sought to have adopted months before any act was committed by Mr. Cole, and which he later succeeded in having adopted by the Association over the reluctance of Mr. Mayer and Mr. Mannix, the actual working executives of MGM. *Thus, a wish entertained by Mr. Johnston over a period of months, unconnected with any particular act of this plaintiff, was transmuted into the resolution. And MGM was left in the position of having to retroject into the past this policy and to find a legal cause for breaching a contract and ridding themselves of an employee with whose services they had been entirely satisfied.* But an American jury has found that Mr. Louis B. Mayer was right and Mr. Eric Johnston was wrong, and Loew's Incorporated was compelled to defend this lawsuit, not because its own executive directors felt that anything had been done to degrade the industry or degrade Cole, but because Mr. Eric Johnston, through his persuasion, insistence and dogged determination, had caused, over their reluctant assent, the adoption of a certain policy. Placed in a position where they had to find a legal cause, the "dear old" morality clause was dug up and an effort was made to tie the matter to it.

This is the way I interpret the verdict of the jury. In what I have said, I do not wish to appear to be critical of Mr. Johnston. He is a man of distinguished achievements. He feels very certain of his position, and he seems to have given entire satisfaction to his employers. All I mean to say is that I am satisfied, as the jury must have been, that MGM did not wish this contract suspended or terminated, and, had the matter been left to their own judgment, they never would have done so. In sum, it was the act of Mr. Johnston and "the New York Office", as Mr. Mayer called them,—which forced them to adopt a policy which an American jury, with all the facts before them, now says was not ground for a suspension of the contract.

## V. A Precedent

Another observation to show that history repeats. Here is an unusual situation, where an employee, who has given satisfaction to his employers—whom they actually want, and whom, if I understand counsel for the defendant aright, *even now they do not wish to let go, so as to give him freedom to use his talents elsewhere,*—a man of this character was suspended and kept without a salary for over a year to satisfy, not a deep conviction of his employ-

---

[9] In referring to the conduct of certain historical characters as dogmatic or absolutist, I have in mind their attitudes as exemplified by the Reverend Timothy Dwight, President of Yale College, who, when speaking of the possibility of Thomas Jefferson's election to the Presidency, warned: "We may see our wives and daughters the victims of legal prostitution; soberly dishonored, speciously polluted; the outcasts of delicacy and virtue, the loathing of God and man." I am using this illustration *not by way of comparison,* but merely to show that this dogmatic type of mind has existed in the United States for a long time. In the past, it was confined to a certain type of the clergy. But Mr. Johnston has demonstrated to me that it has reached the realm of business, and that certain business men now have as dogmatic an attitude towards their relations with the public and the effect of a person's conduct, as that entertained by these clergymen. The attitude is characterized by the familiar saying, "My 'doxy' is orthodoxy, your 'doxy' is heterodoxy".

ers,—but a policy which the employers adopted, along with others in the industry. However, this is not new in motion pictures.

In March of 1929, I decided the Jetta Goudal case. There, an attempt was made to dismiss an employee, who had been entirely satisfactory, merely because she had hurt the ego of one of the Demille Company's directors by arguing with him, or, as they say in motion picture parlance, by saying "no" instead of "yes". Instead of discharging her when she dared say "no", Mr. Cecil B. DeMille kept her on for several weeks, until she had finished a picture, and then discharged her. And the reaction of not only myself, but of the higher courts of California, was identical with the reaction of the jury in this case. This is what I said:[10] "The anomolous situation in the case is that everyone, from president to director, has nothing but praise for the artistry of the plaintiff. They do not complain of any general deficiency in the very pictures in which the disagreements were had. As to one, at least, the director said it was not only the best picture he had made, but the best 'he ever hoped to make', although he is still a young man. The estimates of the finished product by professional critics were of the same character. It was testified that no artist is so earnest about her work,—so desirous of appearing to best advantage. This was the motivation of the suggestions that were made by her. Many of them, the very men who now testify to her temperamental deficiencies, admit they followed it. It was to her interest, as well as to the interest of the defendant, that she be at her best. The defendant was immediately interested. But she had an even greater stake—her entire future career. She was not a 'hack' actress, but an artist receiving what (even in theatrical circles) might be considered a very substantial remuneration, increasing each year. Her value lay, one must assume, not in her ability to obey directions slavishly,—for the humblest extra can do that,—but in her ability to inject the force of her personality, experience, and intelligence into the acting. And if she, having been employed with a view to her known capabilities, could not have been compelled to perform parts of an inferior character, destructive of her artistic reputation, was she not within her rights in arguing about (or even objecting to) particular scenes, which did not give full scope to her artistic ability, or in endeavoring to have them changed, so as to show her to best advantage? We believe she was. *The obedience of an artist is not that of a menial.* There is no more personal art than the dramatic art; none that depends so much upon the whims of the public. A dramatic actress, of the stage or screen, may, by one false move, by one appearance in a play inferior in character to those of her previous repertoire, destroy and ruin her artistic reputation and see the effort of years turned to naught. Shall we say then that, when an actress of admitted ability, demurs to certain scenes in which she is required to act, and thereby causes some delay in the production of a motion picture, she is guilty of such disobedience as to justify her dismissal. We believe not. At any rate, not when, from the very beginning of her employment by the defendant, she was led to believe that her suggestions would be welcome, when such were asked for, as appears from the undisputed testimony relating to the conversations which preceded the writing of the letters which are Exhibits 13, 14 and 15 (the latter dated June 21, 1927, and relating to the very picture around which most of the difficulties seem to center). Nor when, in most instances, her objections being overruled, she performed as directed, and the play, as a whole, was accepted as praiseworthy by all, including the directors with whom the arguments were had."

I then referred to another fact which is relevant here: "Nor do we think that the delays in arriving on the set were of a character to justify the repudiation of her contract by the defendant. Some of these incidents occurred prior to the renewal of March 30, 1927. They should not, therefore, now, be given more weight than the defendant gave to them when, knowing of their occurrence, it made the renewal."

So the problem confronting us here is not entirely new. On the contrary, we have a precedent approved by the District Court

---

[10] Opinion published in the Los Angeles Journal, March 20, 1929.

of Appeal and by the Supreme Court of California.[11]

## VI. Conclusion

In what I have said, I am not to be understood as expressing any views as to whom a man may or may not employ. If an employer, consistently with the law, should enter into a contract, and insist that, as a condition of employment, an employee shall wear a toupee, and afterwards should discharge him because he did not do so, I presume the employer might demand compliance. But in this case, I take the verdict of the jury to mean that when a contract covers all the conditions of employment, its termination is governed entirely by them. And the verdict in this case means also that whether the motion picture industry has or has not the right to refuse to employ persons who are Communists or accused of Communism, when they do employ a person and specify the grounds which govern the relationship between them, they cannot use, as a ground for discharge, a cause which was not thought of at any time by them, but which was forced upon them by a policy of the industry, adopted later. This is not to say that Loew's Incorporated does not have the right to bind itself to a course of conduct. I realize that motion picture making is a rather "touchy" business. Ever since they took a former cabinet officer, Mr. Will Hays, and gave him the same position which Mr. Eric Johnston now occupies, they have had problems to meet relating to the public's attitude. And they have the right to adopt any policy they choose, provided it does not violate the law. But when they have a contract, they cannot take a policy which was not in the minds of the parties when a contract of employment was entered into, or at the time an alleged act was committed by the employee, and read it into the contract in order to make it a ground for an employee's discharge. As already stated, this case presents a similar situation to that which arose in the Jetta Goudal case, in which I held

that, assuming that DeMille Pictures Corporation had the right to discharge Miss Goudal when she declined to act in a scene, they could not allow her to go on and finish the picture and then say, "Now, Mademoiselle, you are through, and we discharge you because three weeks ago you dared say 'no'". In effect, this is the lawsuit here, and I so interpret the action of the jury. *They saw, rightly, that that was the only ploblem involved,—not Communism, not whether Mr. Cole was or was not a Communist.*

I agree with their conclusion, and I have indicated why I accept it. In doing so, I am not expressing any philosophy other than the philosophy which I have expressed here, that, as a Judge, I must enforce the right of contract. Nor do I express any sympathy for, or believe in the heterodox doctrine denounced by the Association of Producers. Anyone can go to my book on the Constitution [12] and to my recent article, "The Background of the American Bill of Rights",[13] and see why I consider Communism, Fascism, Naziism, Falangism, all alike, i. e., totalitarian doctrines which are contrary not only to the letter, but also to the spirit of American life,—doctrines which I disapprove and have always disapproved and opposed consistently.

* * *

The instructions to the Jury which precede the opinion, the opinion itself and the findings and judgment in the case, which follow, entered by United States District Judge Leon R. Yankwich, establish important principles of contract law and define the rights of witnesses before congressional committees. They also serve to illustrate the technique which may be followed in declaratory judgment cases under Sections 2201, 2202, 28 U.S.C.A., wherein a jury is used to decide certain limited questions of fact, and the court renders the actual decision and enters the findings and judgment following the special verdict of the jury. Because of these features, and the importance of the principles of law in-

---

[11] Goudal v. Cecil B. DeMille Pictures Corp., 1931, 118 Cal.App. 407, 5 P.2d 432, 7 P.2d 174.

[12] The Constitution and The Future, 1935, revised in 1937.

[13] Yankwich, The Background of the American Bill of Rights, 37 Georgetown Law Journal, p. 1 et seq.

volved, Judge Yankwich has consented to the publication of the instructions to the jury and of the findings and judgment. They illustrate the practical difficulties which findings in complex cases present and of which Judge Yankwich wrote in his short treatise on Findings published in 8 F.R.D. 272–295.

### Findings of Fact and Conclusions of Law

This cause for declaratory and general equitable relief came on regularly for trial in this Court, before the Honorable Leon R. Yankwich, District Judge Presiding, sitting with a jury, on the 30th day of November, 1948; plaintiff appearing in person together with his counsel, Robert W. Kenny, Esquire, Charles J. Katz, Esquire, and Ben Margolis, Esquire, of the firm of Gallagher, Margolis, McTernan & Tyre; the defendant, Loew's Incorporated, appeared, together with its counsel, Irving M. Walker, Esquire, and Herman Selvin, Esquire, of the firm of Loeb and Loeb; in accordance with the request of the defendant, a jury was impaneled in the mode and manner provided by law; the cause was tried before said jury, commencing on Tuesday, November 30, 1948, and on Wednesday, December 1, 1948, at which date it was continued for further proceedings at the request of the parties until Wednesday, December 8, 1948, and thereupon the cause continued on trial from day to day thereafter, and until Friday, December 17, 1948; on Friday, December 17, 1948, pursuant to the request of the defendant,—but not in the form requested by the defendant,—the following questions of fact were submitted to the jury in the form of special interrogatories:

"Question 1: Did the plaintiff Lester Cole, by his statements and conduct before the House Committee on Un-American Activities, in connection with the hearing held by said Committee, bring himself, or tend to bring himself, into public hatred, contempt, scorn or ridicule? (Answer 'Yes' or 'No'.)

"Answer: ——————————

"Question 2: Did the plaintiff Lester Cole, by his statements and conduct before the House Committee on Un-American Ac-tivities in connection with the hearing held by said Committee, tend to shock, insult or offend the community? (Answer 'yes' or 'no'.)

"Answer: ——————————

"Question 3: Did the plaintiff Lester Cole, by his statements and conduct before the House Committee on Un-American Activities in connection with the hearing held by said Committee, prejudice the defendant Loew's Incorporated as his employer or the motion picture industry generally? (Answer 'yes' or 'no'.)

"Answer: ——————————

"Question 4: Did the defendant Loew's Incorporated, by its conduct toward the plaintiff, subsequent to the hearing, waive the right to take action against him by suspending him? (Answer 'yes' or 'no'.)

"Answer: ——————————"

The cause was fully argued to the said jury by Irving M. Walker and Herman Selvin on behalf of the defendant, and by Robert W. Kenny and Charles J. Katz on behalf of the plaintiff; thereupon, and following instructions by the Court, the said four special interrogatories were submitted to the jury, and on December 17, 1948, after deliberation the jury unanimously rendered a special verdict as follows:

"Question 1: Did the plaintiff Lester Cole, by his statements and conduct before the House Committee on Un-American Activities, in connection with the hearing held by said Committee, bring himself, or tend to bring himself, into public hatred, contempt, scorn or ridicule? (Answer 'Yes' or 'No'.)

"Answer: No.

"Question 2: Did the plaintiff Lester Cole, by his statements and conduct before the House Committee on Un-American Activities in connection with the hearing held by said Committee, tend to shock, insult or offend the community? (Answer 'yes' or 'no'.)

"Answer: No.

"Question 3: Did the plaintiff Lester Cole, by his statements and conduct before the House Committee on Un-American Activities in connection with the hearing held by said Committee, prejudice the defend-

ant Loew's Incorporated as his employer or the motion picture industry generally? (Answer 'yes' or 'no'.)

"Answer: No.

"Question 4: Did the defendant Loew's Incorporated, by its conduct toward the plaintiff, subsequent to the hearing, waive the right to take action against him by suspending him? (Answer 'yes' or 'no'.)

"Answer: Yes."

Immediately thereupon and at the request of the defendant, each of the said twelve jurors was polled and each stated in open court upon oath that said special verdict was in fact his (or her) verdict.

On December 17, 1948, and after the submission of said special interrogatories to the jury, the parties stipulated in open court that neither desired to introduce any other or additional evidence before the Court, and thereupon the Court continued the matter for further proceedings until December 20, 1948.

Thereafter and on December 20, 1948, further proceedings were had before the Court, sitting without a jury, following which the cause was submitted to the Court for decision.

On December 20, 1948, the Court announced and ruled that it accepted the special verdict of said jury and approved the same in all respects and adopted the same in all particulars.

The Court hereby adopts the special verdict of the jury in its entirety and upon the basis thereof and in the exercise of its own jurisdiction, the Court in accordance with the foregoing, and upon all the records and all of the evidence heard by the Court in this cause sitting both with and without said jury does now make the following Findings of Fact and Conclusions of Law:

### Findings of Fact

I. The Court finds all of the following facts to be true:

(1) Plaintiff is a resident of the County of Los Angeles, State of California. Plaintiff is by profession a writer, and has had long experience in working as a writer in the motion picture industry. Defendant, Loew's Incorporated, is a corporation organized under the laws of Delaware; it maintains a principal office and transacts business in the County of Los Angeles State of California. It is engaged, among other things, in the business of producing motion pictures.

(2) On December 5, 1945, plaintiff and defendant entered into an employment contract, a photostatic copy of which is now in evidence in these proceedings and marked Exhibit "2"; that thereafter, and on September 22, 1947, plaintiff and defendant entered into a written amendment to the said contract which is now in evidence in these proceedings, marked Exhibit "3"; by the terms of said contract of employment dated December 5, 1945, as so amended on September 22, 1947, the present term of said contract of employment began on November 15, 1947, and ends on November 15, 1949, and provides for the payment of compensation by the defendant to the plaintiff at the rate of $1,350 per week for each and every week during the term thereof, and by the further provisions of said contract of employment as amended, the defendant is granted certain options to extend the period of said contract for further and additional terms beyond November 15, 1949.

(3) Plaintiff has well and truly performed all of the terms, conditions and covenants of said contract of employment on his part to be performed, and was on December 2, 1947, and ever since said date has been and now is ready, willing and able to perform all of the terms, conditions, covenants, obligations and provisions of said contract on his part to be performed.

(4) On or about December 2, 1947, the defendant, Loew's Incorporated, served upon the plaintiff, Lester Cole, a notice of suspension reading as follows:

"Loew's Incorporated
Metro-Goldwyn-Mayer Pictures
Culver City, California
December 2, 1947

Mr. Lester Cole
c/o Metro-Goldwyn-Mayer Studios
Culver City, California
Dear Mr. Cole:

At a recent hearing of a committee of the House of Representatives, you refused

to answer certain questions put to you by such committee.

By your failure to answer these questions, and by your statements and conduct before the committee and otherwise in connection with the hearings, you have shocked and offended the community, brought yourself into public scorn and contempt, substantially lessened your value to us as an employee, and prejudiced us as your employer and the motion picture industry in general. By so doing, you have violated your obligations under you contract of employment with us and your legal obligations to us as our employee.

Accordingly, and for good and sufficient cause, this is to notify you that we have elected to suspend your employment and payment of your compensation under your contract of employment with us dated December 5, 1945, as amended, commencing as of December 3, 1947 and continuing until such time as you are acquitted or have purged yourself of contempt of the Congress of the United States and you declare under oath that you are not a Communist.

This action is taken by us without prejudice to, and we hereby reserve, any other rights or remedies which we may have.

Very truly yours,
Loew's Incorporated
By Louis K. Sidney
Asst. Treasurer"

(5) A controversy affecting the rights of the parties under the said agreement and the amendment thereto in evidence in these proceedings as Exhibit "2" and Exhibit "3" does exist between plaintiff and defendant. Said controversy involves, among other things, the notice of suspension hereinabove set forth. By said notice of suspension the defendant purported to exercise a right to suspend the plaintiff's employment and payment of compensation to the plaintiff. Defendant contends and asserts that on December 2, 1947 it had, and that it now has, the right to suspend and to continue to suspend the plaintiff's employment and to suspend and to continue to suspend payment of compensation to the plaintiff.

In the course of the proceedings, defendant contended that if for any reason said notice of suspension was ineffective as a suspension of plaintiff, it was nevertheless tantamount to and was effective as a discharge of plaintiff.

Plaintiff contends that each and every statement of fact contained in the said notice of suspension is false and untrue; plaintiff further contends, notwithstanding the truth or falsity of any such statement in the said notice of suspension, the defendant did not on December 2, 1947, or at any other time have the right to suspend, and the defendant does not have the right to continue to suspend, the plaintiff's employment or payment of compensation to the plaintiff for any of the purported reasons, grounds, or conditions stated in the said notice of suspension; and the plaintiff further contends that no grounds or reasons existed on December 2, 1947, and none has existed since, and none exists now which gave or gives the defendant any right to suspend either the plaintiff's employment or payment of his compensation.

All of the contentions of plaintiff are supported by the evidence and the Court hereby finds them to be true; none of the contentions of defendant is supported by the evidence and the Court hereby finds them to be untrue.

(6) (a) The plaintiff, Lester Cole, by his statements and conduct before the House Committee on Un-American Activities in connection with the hearing held by said Committee, did not bring himself, or tend to bring himself, into public hatred, contempt, scorn or ridicule.

(b) The plaintiff, Lester Cole, by his statements and conduct before the House Committee on Un-American Activities in connection with the hearing held by said Committee, did not tend to shock, insult or offend the community.

(c) The plaintiff, Lester Cole, by his statements and conduct before the House Committee on Un-American Activities in connection with the hearing held by said Committee, did not prejudice the defendant, Loew's Incorporated, as his employer or the motion picture industry generally.

(d) The defendant, Loew's Incorporated, by its conduct toward the plaintiff, subsequent to the hearing, did waive the right

to take action against him by suspending him.

(7) The grounds set forth in said notice of suspension are false and untrue.

(8) The grounds set forth in said notice of suspension do not constitute any basis for such an order of suspension, and are not grounds for any order of suspension or for the termination of said contract, or for the discharge of the plaintiff.

(9) The acts and conduct of the plaintiff before said House Committee were within the plaintiff's rights and did not constitute any breach on the part of the plaintiff of his contract of employment with the defendant.

(10) The acts and conduct of the defendant prior to October 30, 1947, led plaintiff to belief, and the plaintiff did believe, that if plaintiff conducted himself before said House Committee and in connection with its said hearing in the manner in which plaintiff did there conduct himself, that such conduct of plaintiff would not give rise to the right on the part of defendant to suspend plaintiff's employment, or to discharge or otherwise discipline him.

(11) On October 30, 1947, defendant knew what the acts and conduct of plaintiff were before said House Committee and in connection with said hearing; notwithstanding said knowledge, defendant after October 30, 1947, accepted and retained plaintiff in its employ pursuant to the provisions of said employment contract as amended, with the intent to keep him as defendant's employee under the terms and provisions of said contract as amended, and accepted the benefit of the services of plaintiff on the screen play "Zapata", and otherwise, until on or about December 3, 1947. Defendant with full knowledge of the aforesaid acts and conduct of plaintiff did not elect to treat them as a breach of contract, but on the contrary elected to maintain the contract in full force and effect, notwithstanding said conduct.

(12) Defendant Loew's Incorporated did not at any time prior to or on October 30, 1947, instruct plaintiff as to how he should or should not conduct himself before said House Committee or in connection with its hearings.

(13) The plaintiff has been and, unless this Court grants appropriate injunctive relief, will be irreparably injured in that by reason of said purported suspension plaintiff is required to refrain from seeking employment elsewhere and is required to remain uncompensated and unemployed and is prevented from finding gainful employment in the motion picture industry and is prevented from writing and selling any literary material to any other motion picture producer, publisher, or theatrical producer.

II. All of the factual matters alleged in plaintiff's complaint and not otherwise specifically found to be true by the foregoing Findings, are hereby found to be true; all the factual matters alleged in defendant's answer and not hereinbefore otherwise set forth, are hereby found to be untrue.

### Conclusions of Law

Upon the said special verdict of the jury and upon the Findings of Fact hereinabove set forth, the Court makes the following Conclusions of Law:

I. The plaintiff is entitled to a declaration that defendant Loew's Incorporated does not now have and never has had any right to suspend plaintiff Lester Cole's employment or compensation pursuant to that certain notice of suspension served by the defendant upon the plaintiff on or about December 2, 1947, which notice of suspension is fully set forth in the Findings of Fact herein, or otherwise; that said notice of suspension is null and void; that the alleged conduct of plaintiff Lester Cole referred to in said notice of suspension, and each and all of the grounds relied upon by the defendant therein has and have never, and is and are not now any valid ground or grounds for the order of suspension; that the action of the plaintiff, when appearing before the Committee and his entire conduct with relation to the hearings, either before or at or about the time, were within his rights and did not constitute a breach on his part of clause 5 of the contract which has been designated as the public relations morality clause, or any other portion of the contract; at no time has any ground existed nor does any ground now exist for the suspension or termination of the contract between plaintiff and defend-

ant, a copy of which contract is attached hereto, marked "Exhibit A".

II. The notice of suspension hereinabove set out and served by the defendant upon the plaintiff on or about December 2, 1947, is null and void.

III. As a matter of law, no cause existed on or prior to December 2, 1947, and none has existed since that date, justifying the defendant in suspending said contract.

IV. As a matter of law, no cause existed on or prior to December 2, 1947, and none has existed since that date, justifying the defendant in terminating said contract.

V. As a matter of law, no cause existed on or prior to December 2, 1947, and none has existed since that date, justifying the defendant in discharging the plaintiff.

VI. The plaintiff has well and truly performed all of the terms, conditions, covenants and obligations of said contract on his part to be performed and the said contract is now in full force and effect.

VII. The notice of suspension hereinabove set out and served by defendant on plaintiff on or about December 2, 1947, was a breach on the part of the defendant of its obligations under its contract with plaintiff and a breach of the rights of plaintiff under said contract.

VIII. The plaintiff is entitled to receive his salary from the defendant at the rate of $1,350 per week for each and every week commencing December 2, 1947, and continuing until the date of the entry of this judgment and thereafter at the rate of $1,350 per week as hereinafter provided; in the period between December 2, 1947 and December 30, 1948, a period of 56 weeks, there accrued the sum of $75,600, and as at December 30, 1948, the said sum of $75,600 accrued and remained unpaid, and said sum of $75,600 is now due and payable by the defendant, Loew's Incorporated, to the plaintiff, together with interest thereon computed at the rate of 7% per annum on each weekly sum of $1,350 from the particular date during the period between December 2, 1947, and December 30, 1948, when each said weekly sum became due and continuing until the entire sum, plus such interest, is paid.

IX. The plaintiff is entitled to an order directing defendant to reinstate plaintiff to his contract of employment, and to pay the plaintiff the sum of $1,350 per week during each and every week subsequent to December 30, 1948 and continuing until November 15, 1949, and so long as plaintiff remains during said period, ready, willing and able to perform all of the terms, conditions and covenants of said contract on his part to be performed, excepting only that plaintiff is entitled to have and receive of the defendant six weeks' vacation with pay during the period between December 30, 1948 and November 15, 1949, and during said six weeks' period of vacation with pay, plaintiff should not be required to hold himself in readiness to render any services for the defendant, or to render any such services for the defendant, and provided in addition during the period December 30, 1948, through November 15, 1949, plaintiff is entitled to a leave of absence without pay, if the plaintiff elects to take the same for a period of six weeks during which plaintiff should not be required to hold himself in readiness to perform any services for the defendant, or to perform any such services, if the plaintiff elects to take such leave of absence.

X. Plaintiff is entitled to an order directing the defendant forthwith to take appropriate corporate action to set aside, and to adopt appropriate resolutions setting aside, the said notice of suspension, dated December 2, 1947, and specifically described in paragraph (4) of the Findings herein, and plaintiff is entitled to an order directing defendant forthwith to declare in writing that said suspension has been set aside and is at an end.

XI. By reason of all of the facts hereinabove recited and found to be true, plaintiff is entitled to an injunction enjoining and restraining the defendant from in any mode or manner continuing such suspension in effect.

XII. The Court should retain continuing jurisdiction over the plaintiff and defendant to enforce compliance by the plaintiff and defendant with the terms and provisions of this judgment, so that the plaintiff need not resort to any other proceed-

534

ing in connection with the enforcement of the provisions of the judgment herein.

\* \* \*

## Judgment

This cause for declaratory and general equitable relief came on regularly for trial in this Court, before the Honorable Leon R. Yankwich, District Judge Presiding, sitting with a jury, on the 30th day of November, 1948; plaintiff appearing in person, together with his counsel, Robert W. Kenny, Esquire, Charles J. Katz, Esquire, and Ben Margolis, Esquire, of the firm of Gallagher, Margolis, McTernan & Tyre; the defendant, Loew's Incorporated, appeared, together with its counsel, Irving M. Walker, Esquire, and Herman Selvin, Esquire, of the firm of Loeb and Loeb; in accordance with the request of the defendant, a jury was impanelled in the mode and manner provided by law; the cause was tried before said jury, commencing on Tuesday, November 30, 1948, and on Wednesday, December 1, 1948, at which date it was continued for further proceedings at the request of the parties until Wednesday, December 8, 1948, and thereupon the cause continued on trial from day to day thereafter, and until Friday, December 17, 1948; on Friday, December 17, 1948, pursuant to the request of the defendant, the following questions of fact were submitted to the jury in the form of special interrogatories:

"Question 1: Did the plaintiff Lester Cole, by his statements and conduct before the House Committee on Un-American Activities, in connection with the hearing held by said Committee, bring himself, or tend to bring himself into public hatred, contempt, scorn or ridicule? (Answer 'Yes' or 'No'.)

"Answer: ——————

"Question 2: Did the plaintiff Lester Cole, by his statements and conduct before the House Committee on Un-American Activities in connection with the hearing held by said Committee, tend to shock, insult or offend the community? (Answer 'Yes' or 'No'.)

"Answer: ——————

"Question 3: Did the plaintiff Lester Cole, by his statements and conduct before the House Committee on Un-American Activities in connection with the hearing held by said Committee, prejudice the defendant Loew's Incorporated as his employer or the motion picture industry generally? (Answer 'yes' or 'no'.)

"Answer: ——————"

At the request of the plaintiff, the following special interrogatory was submitted to the said jury:

"Question 4: Did the defendant Loew's Incorporated, by its conduct toward the plaintiff, subsequent to the hearing, waive the right to take action against him by suspending him? (Answer 'yes' or 'no'.)

"Answer: ——————"

The cause was fully argued to the said jury by Irving M. Walker and Herman Selvin on behalf of the defendant, and by Robert W. Kenny and Charles J. Katz on behalf of the plaintiff; thereupon, and following instructions by the Court, the said four special interrogatories were submitted to the jury, and on December 17, 1948, after deliberation the jury unanimously rendered a special verdict as follows:

"Question 1: Did the plaintiff Lester Cole, by his statements and conduct before the House Committee on Un-American Activities, in connection with the hearing held by said Committee, bring himself, or tend to bring himself into public hatred, contempt, scorn or ridicule? (Answer 'yes' or 'no'.)

"Answer: No.

"Question 2: Did the plaintiff Lester Cole, by his statements and conduct before the House Committee on Un-American Activities in connection with the hearing held by said Committee, tend to shock, insult or offend the community? (Answer 'yes' or 'no'.)

"Answer: No.

"Question 3: Did the plaintiff Lester Cole, by his statements and conduct before the House Committee on Un-American Activities in connection with the hearing held by said Committee, prejudice the defendant Loew's Incorporated as his employer or the motion picture industry generally? (Answer 'yes' or 'no'.)

"Answer: No.

"Question 4: Did the defendant Loew's Incorporated, by its conduct toward the plaintiff, subsequent to the hearing, waive the right to take action against him by suspending him? (Answer 'yes' or 'no'.)

"Answer: Yes."

Immediately thereupon and at the request of the defendant, each of the said twelve jurors was polled and each stated in open court upon oath that said special verdict was in fact his (or her) verdict.

On December 17, 1948, and after the submission of said special interrogatories to the jury, the parties stipulated in open court that neither desired to introduce any other or additional evidence before the Court, and thereupon the Court continued the matter for further proceedings until December 20, 1948.

Thereafter and on December 20, 1948, further proceedings were had before the Court sitting without a jury, following which the cause was submitted to the Court for decision.

On December 20, 1948, the Court announced and ruled that it accepted the special verdict of said jury and approved the same in all respects and adopted the same in all particulars.

In accordance with the foregoing, and upon all the records and all of the evidence heard by the Court in this cause, sitting both with and without said jury, and the Court having made and entered its Findings of Fact and Conclusions of Law, does now order judgment as follows:

I. This Court hereby declares that defendant Loew's Incorporated does not now have and never has had any right to suspend plaintiff, Lester Cole's employment or compensation pursuant to that certain notice of suspension served by the defendant upon the plaintiff on or about December 2, 1947, which notice of suspension is fully set forth in paragraph VI below, or otherwise; that said notice of suspension is null and void; that the alleged conduct of plaintiff Lester Cole, referred to in said notice of suspension and each and all of the grounds relied upon by defendant therein has and have never and is and are not now any valid ground or grounds for the order of suspension; that the action of the plaintiff, when appearing before the Committee and his entire conduct with relation to the hearings, either before or at or about the time, were within his rights and did not constitute a breach on his part of clause 5 of the contract which has been designated as the public relations morality clause, or any other portion of the contract; at no time has any ground existed nor does any ground now exist for the suspension or termination of the contract between plaintiff and defendant, a copy of which contract is attached hereto, marked "Exhibit A".

II. That the plaintiff have and recover of the defendant the sum of $1,350 per week for each and every week elapsed during the period beginning December 2, 1947, and continuing through and including December 30, 1948, amounting as at December 30, 1948, to the sum of $75,600.

III. That the defendant is hereby ordered and directed to reinstate the plaintiff to his employment with the defendant under and pursuant to that certain contract of employment dated December 5, 1945, as amended by the parties in writing on September 22, 1947, a true and correct copy of which contract as so amended is annexed to this judgment, marked Exhibit "A" and made a part hereof as though specifically set forth verbatim at this point.

IV. That the defendant, if it fails to comply fully with the provisions of paragraph III above, is hereby ordered to pay to the plaintiff during each week subsequent to December 30, 1948, through and including November 15, 1949, the sum of $1,350 per week for each such week during which plaintiff continues to be ready, willing and able to perform all of the services required of him to be performed by the terms of said contract.

V. That plaintiff recover interest at the rate of 7% per annum from the defendant on all sums due and payable by the defendant to the plaintiff, as herein set forth, and that each weekly amount of $1,350 so payable by the defendant to the plaintiff during the period commencing December 2, 1947, bear interest at the rate of 7% per annum until the date when each said weekly amount of $1,350 shall have been paid by the defendant to the plaintiff.

VI. That the defendant is hereby ordered forthwith to take appropriate corporate action to set aside, and to adopt appropriate resolutions declaring the suspension of Lester Cole at an end and setting aside and cancelling that certain notice of suspension served by the defendant upon the plaintiff on or about December 2, 1947, which notice of suspension reads as follows:

"Loew's Incorporated
Metro-Goldwyn-Mayer Pictures
Culver City, California
December 2, 1947

Mr. Lester Cole
c/o Metro-Goldwyn-Mayer Studios
Culver City, California

Dear Mr. Cole:

At a recent hearing of a committee of the House of Representatives, you refused to answer certain questions put to you by such committee.

By your failure to answer these questions, and by your statements and conduct before the committee and otherwise in connection with the hearings, you have shocked and offended the community, brought yourself into public scorn and contempt, substantially lessened your value to us as an employee, and prejudiced us as your employer and the motion picture industry in general. By so doing, you have violated your obligations under your contract of employment with us and your legal obligations to us as our employee.

Accordingly, and for good and sufficient cause, this is to notify you that we have elected to suspend your employment and payment of your compensation under your contract of employment with us dated December 5, 1945, as amended, commencing as of December 3, 1947 and continuing until such time as you are acquitted or have purged yourself of contempt of the Congress of the United States and you declare under oath that you are not a Communist.

This action is taken by us without prejudice to, and we hereby reserve, any other rights or remedies which we may have.

Very truly yours,
Loew's Incorporated
By Louis K. Sidney
Asst. Treasurer."

VII. Upon all of the Findings of Fact and Conclusions of Law, together with the special verdict of the jury hereinbefore referred to, and because the said notice of suspension above set forth is null and void, and its continued enforcement will irreparably injure plaintiff in that by reason of said notice of suspension and the effectuation thereof, plaintiff is required to refrain from seeking employment elsewhere than with defendant while simultaneously being prevented from working for the defendant and is thus totally excluded from employment in the motion picture industry and is prevented from writing and selling any literary material to any other motion picture producer, publisher or theatrical producer, it is hereby ordered, adjudged and decreed that the defendant, its officers, agents, servants, employees and attorneys, and all persons acting in concert or participating with the defendant who receive actual notice hereof by personal service or otherwise, be, and they and each of them are, hereby enjoined and restrained from continuing in force or effect that certain notice of suspension served by the defendant upon the plaintiff on or about December 2, 1947, which notice of suspension is fully set forth in paragraph VI above.

VIII. This Court will retain jurisdiction over the parties for the purpose of enforcing the terms hereof and so that plaintiff need not resort to any other action to enforce the terms of this judgment, or any part thereof, or to obtain judgment for such additional sums in the future as may become due.

IX. That plaintiff have and recover judgment against the defendant in the sum of $78,398.64, and for his costs of suit incurred herein.

### Exhibit "A"

Agreement executed at Culver City, California, December 5, 1945 by and between Loew's Incorporated, a Delaware corporation, hereinafter referred to as the "producer" and Lester Cole, hereinafter referred to as the "employee",

### Witnesseth:

For and in consideration of the covenants, conditions and agreements herein-

after contained and set forth, the parties hereto have agreed and do hereby agree as follows:

1. The producer hereby employs the employee to render his exclusive services as herein required for and during the term of this agreement and the employee hereby accepts such employment and agrees to keep and perform all of the duties, obligations and agreements assumed and entered into by him hereunder.

2. The employee agrees that throughout the term hereof he will write stories, adaptations, continuities, scenarios and dialogue and that he will render such other services in the editorial department of the producer as the producer may request; that when and as requested by the producer he will render his services as a producer and/or associate producer and in such other executive capacity, or capacities, as the producer may require and as the employee may be capable of performing; that he will promptly and faithfully comply with all reasonable instructions, directions, requests, rules and regulations made or issued by the producer in connection herewith; and that he will perform and render his services hereunder conscientiously and to the full limit of his ability and as instructed by the producer at all times and wherever required or desired by the producer. The term "photoplays" as used in this agreement shall be deemed to include, but not be limited to, motion picture productions produced and/or exhibited and/or transmitted with sound and voice recording, reproducing and/or transmitting devices, television, radio devices and all other improvements and devices which are now or hereafter may be used in connection with the production and/or exhibition and/or transmission of any present or future kind of motion picture productions.

3. The employee expressly agrees that he will render his services solely and exclusively for the producer throughout the term hereof, and that during said term he will not render services of any kind or nature whatsoever either to or for himself or to or for any person, firm or corporation other than the producer, without the written consent of the producer first had and obtained. The employee further agrees that he will not consent to nor permit any other person to advertise, announce or make known, directly or indirectly, by paid advertisements, press notices or otherwise, that he has contracted to do any act or perform any services contrary to the terms of this agreement. The producer shall have the right to institute any legal proceedings, in the name of the employee or otherwise, to prevent such acts or any of them. The employee agrees not to engage or use any publicity representative nor to issue or permit the issuance of any advertising, exploitation or publicity whatsoever concerning the employee during the term of this agreement, without the prior written consent of the producer first had and obtained.

4. The producer, its successors and assigns, shall, in addition to the employee's services, be entitled to and shall own solely and exclusively all of the results and proceeds thereof (including all rights throughout the world of production, recordation, broadcasting and reproduction by any art or method, copyright, trademark and patent), whether such results and proceeds consist of literary, dramatic, musical, motion picture, mechanical or any other form of works, themes, ideas, compositions, creations or products; and the employee does hereby assign and transfer to the producer all of the foregoing without reservation, condition or limitation. In the event that the producer shall desire to secure separate assignments of any of the foregoing, the employee shall execute and deliver the same to the producer upon the producer's request therefor. As to literary and/or dramatic material such assignments shall be substantially similar to Exhibit "A" which is hereunto attached, hereby referred to and by this reference made a part hereof; provided, however, that except as to original stories any and all warranties contained in said Exhibit "A" shall be deemed to be amended to read as follows: "I agree and warrant that except as provided in the next sentence hereof all material composed and/or submitted by me hereunder for or to the purchaser shall be wholly original with me and shall not infringe upon or violate the right of privacy of, or constitute a libel or slander against or violate any common law or rights or any other rights

of any person, firm or corporation. The same agreements and warranties are made by me with reference to any and all material, incidents, treatment, character and action which I may add to or interpolate in any material assigned to me by the purchaser for preparation, but are not made with respect to violations or infringements contained in the material so assigned to me by the purchaser. I agree that all material composed, submitted, added and/or interpolated by me hereunder shall automatically become the property of the purchaser who, for this purpose, shall be deemed the author thereof, I acting entirely as the purchaser's employee.

The employee further agrees to execute and deliver to the producer in connection with all literary material written by him hereunder, a certificate in substantially the following form: "I hereby certify that I wrote the manuscript hereto attached, as an employee of Loew's Incorporated, pursuant to an agreement dated the day of , 19 , in performance of my duties thereunder, and in the regular course of my employment and that said Loew's Incorporated is the author thereof and entitled to the copyright therein and thereto, with the right to make such changes therein and such uses thereof as it may determine as such author.

"In Witness Whereof I have hereto set my hand this day of , 19 ."

It is further understood and agreed that with respect to all literary material written by the employee hereunder all of the rights, privileges, warranties and agreements granted, made and/or set forth in said Exhibit "A" shall vest in and inure to the benefit of the producer forthwith upon the creation or submission of such material, whether or not the employee executes such assignment. The producer shall have the further exclusive right to use and display the name, voice and likeness of the employee for advertising, commercial and/or publicity purposes during the term of employment and perpetually in connection with all work of the employee hereunder. The employee shall not transfer or attempt to transfer any right, privilege, title or interest in or to any of the things above specified, nor shall he at any time grant the

right to, authorize or willingly permit any person, firm or corporation other than the producer in any way to infringe upon such exclusive rights hereby granted to the producer, and authorizes the producer in the name of the employee, or otherwise, to institute any legal proceedings to prevent such infringement. All rights herein granted to the producer shall vest in the producer, whether this agreement is terminated by the completion of all services herein agreed to be performed by the employee, or is sooner terminated by virtue of any right of termination herein granted to the producer, or otherwise.

5. The employee agrees to conduct himself with due regard to public conventions and morals, and agrees that he will not do or commit any act or thing that will tend to degrade him in society or bring him into public hatred, contempt, scorn or ridicule, or that will tend to shock, insult or offend the community or ridicule public morals or decency, or prejudice the producer or the motion picture, theatrical or radio industry in general.

6. The employee hereby expressly gives and grants to the producer the right to lend the services of the employee to any other person or persons, in any capacity in which the employee is required to render his services hereunder, upon the distinct understanding and condition, however, that this contract shall nevertheless continue in full force and effect and that the employee shall not be required to do any act or perform any services contrary to the provisions of this agreement. Any breach by any such person, however, of any of the terms of this agreement shall not constitute a breach by the producer of its obligations or covenants under this agreement, nor shall the employee have the right to terminate this agreement by reason of any such breach by any such person, but the employee, at his option, in the event of such breach by any such person shall be released from the obligation to render further services to such person. In the event that the employee is required to render services for any other person or persons as hereinabove provided, he agrees to render the same to the best of his ability. Should the services of the employee be loaned to any other per-

son or persons hereunder, such other person or persons, at the option of the producer, shall be entitled to all or any of the advertising and other rights in connection with services rendered by the employee for such other person or persons as are given to the producer under the terms of this agreement.

7. In the event that the producer desires, at any time or from time to time, to apply in its own name or otherwise, but at its own expense, for life, health, accident or other insurance covering the employee, the employee agrees that the producer may do so and may take out such insurance for any sum which the producer may deem necessary to protect its interests hereunder. The employee shall have no right, title or interest in or to such insurance, but agrees nevertheless to assist the producer in procuring the same by submitting to the usual and customary medical and other examinations and by signing such applications and other instruments in writing as may reasonably be required by such insurance company or companies.

8. In the event that by reason of mental or physical disability, or otherwise, the employee shall be incapacitated from fully performing the terms hereof or complying with each and all of his obligations hereunder, then this agreement shall be suspended during the period of such disability or incapacity, and no compensation need be paid the employee during the period of such suspension. The term of this agreement, and all of its provisions herein contained, may be extended, at the option of the producer, for a period equivalent to all or any part of the period of such suspension. The producer, at its option, in the event of the continuance of such disability or incapacity for a period or aggregate of periods in excess of two (2) weeks during any year of the term hereof, may cancel and terminate this employment. In the event of the occurrence of any disability or incapacity of the employee, the employee shall give the producer written notice of such disability or incapacity within twenty-four (24) hours after the commencement thereof. In the absence of such notice any failure of the employee (whether or not caused by his disability or incapacity) to report to the producer as and when instructed by the producer, for the rendition of his required services hereunder, may, at the producer's option (unless because of such disability or incapacity the producer expressly excuses the employee from reporting for work or expressly dismisses the employee from work) be treated by the producer as failure, refusal and/or neglect of the employee in the performance of his obligations and agreements hereunder and shall entitle the producer to exercise any and all rights and/or remedies which, in the event of failure, refusal or neglect, are available to the producer under the provisions of paragraph 11 hereof or at law or in equity. The producer shall have the right, at its option, to have the employee examined at any time and from time to time by such physician or physicians as the producer may designate. The employee agrees to make himself available for any and all such examinations as and when requested and to submit to such examinations and tests as such physician or physicians may deem desirable.

9. In the event that at any time during the term hereof the producer, or any person to whom the services of the employee are loaned by the producer hereunder, should be materially hampered, interrupted or interfered with in the preparation, production or completion of photoplays by reason of any fire, casualty, lockout, strike, labor conditions, unavoidable accident, riot, war, act of God, or by the enactment of any municipal, state or federal ordinance or law, or by the issuance of any executive or judicial order or decree, whether municipal, state or federal, or by any other legally constituted authority, or by any national or local emergency or condition, or by any other cause of the same or any similar kind or character, or if for any reason whatsoever the majority of the motion picture theatres in the United States shall be closed for a week or any period in excess of a week, then and in any of said events this agreement, at the option of the producer, may be suspended likewise during the continuance of such event or events, no compensation need be paid the employee during the period of such suspension, and the term of this agreement, at the option

of the producer, may be continued and extended, upon the same terms and conditions as shall then be operative hereunder, for a period equivalent to all or any part of any period or periods during which any such event or events shall continue. If such suspension or suspensions or any such event or events should continue for a period or aggregate of periods in excess of twelve (12) weeks during any year of the term hereof, then and in that event either the employee or the producer, at his or its option, may elect to terminate the employee's employment hereunder; provided, however, that should the employee desire to elect to terminate his employment he shall serve notice of such desire upon the producer at or after the expiration of such period or periods, and if the producer should not resume the payment of the weekly compensation hereinafter specified, commencing as of not later than one (1) week after the receipt of such notice from the employee, then and in that event the employment of the employee hereunder shall be terminated. If the producer should resume the payment of such compensation, commencing as of not later than one (1) week after the receipt of such notice, then and in that event the employment of the employee hereunder shall not be terminated, but shall continue in full force and effect.

10. Notwithstanding anything elsewhere contained herein, it is expressly agreed that if at the time of the expiration of this agreement the employee is engaged in the rendition of any of his required services hereunder in connection with any matter or thing not then completed, and if the producer shall not then have exercised an option for the further services of the employee for a further period, then and in that event the employee's employment hereunder, at the option of the producer, may be continued and extended, at the same rate of salary and upon the same conditions as shall be operative hereunder immediately prior to the time of such expiration, until the completion of such of the employee's required services hereunder as the producer may desire in connection therewith, not exceeding sixty (60) days.

11. It is distinctly understood and agreed by and between the parties hereto that the services to be rendered by the employee under the terms hereof, and the rights and privileges granted to the producer by the employee under the terms hereof, are of a special, unique, unusual, extraordinary and intellectual character which gives them a peculiar value, the loss of which cannot be reasonably or adequately compensated in damages in an action at law, and that a breach by the employee of any of the provisions contained in this agreement will cause the producer irreparable injury and damage. The employee hereby expressly agrees that the producer shall be entitled to injunctive and other equitable relief to prevent a breach of this agreement by the employee. Resort to injunctive and other equitable relief, however, shall not be construed as a waiver of any other rights that the producer may have in the premises, for damages, or otherwise. In the event of the failure, refusal or neglect of the employee to perform his required services or observe any of his obligations hereunder to the full limit of his ability or as instructed, the producer, at its option, shall have the right to cancel and terminate this employment, may refuse to pay the employee any compensation for and during the period of such failure, refusal or neglect on the part of the employee, and shall likewise have the right to extend the term of this agreement and all of its provisions for a period equivalent to all or any part of the period during which such failure, refusal or neglect continues. If at the time of such failure, refusal or neglect, the employee shall have been instructed to render any of his required services hereunder, the producer shall have the right to refuse to pay the employee any compensation for and during the time which would have been reasonably required to complete such services, or (should another person be engaged or instructed to perform such services) until the completion of such services by such other person, and in any or either of such events the producer shall also have the right to extend the term of this agreement and all of its provisions for a like period of time

or for any portion thereof. Should the producer notify the employee that the employee has been scheduled to perform any of his required services hereunder, and should the employee thereupon or at any time prior to the designated date of commencement of the rendition of such services advise the producer that the employee does not intend to render such services, the producer shall thereupon or at any time thereafter have the right to refuse to pay the employee any compensation commencing as of the date on which the employee has so advised the producer of his intent not to perform, or, at the producer's election, as of any time thereafter, and continuing until the expiration of the time which would have been reasonably required to complete such services, or (should another person be engaged or instructed to perform such services) until the completion of the rendition of such services by such other person; and in any or either of such events the producer shall also have the right to extend the term of this agreement and all of its provisions for a like period of time, or any portion thereof. Any period for or during which the producer is entitled to refuse to pay compensation to the employee pursuant to any of the provisions of this paragraph shall, unless sooner terminated, and if and when the employee shall be requested by the producer to, and shall render, other services hereunder. The producer shall also have the right, at its option, to extend the term of this agreement and all of its provisions for a period of time equivalent to all or any part of any leave or leaves of absence granted the employee by the producer during the term hereof. Each and all of the several rights, remedies and options of the producer contained in this agreement shall be construed as cumulative and no one of them as exclusive of the others or of any right or remedy allowed by law. All options granted to the producer herein for extending the term of this agreement, other than the options hereinafter in paragraph 18 specifically set forth, may be exercised by the producer by notice in writing to be served upon the employee at any time prior to the expiration of the term hereof.

12. If this agreement be suspended or if the producer refuse to pay the employee compensation, pursuant to any right to do so herein granted to the producer, or if the producer grant any lease of absence to the employee, and if in connection with such suspension, refusal to pay or leave of absence the producer shall exercise the right to extend this agreement for a period equivalent to all or any part of the period of such suspension, refusal to pay or leave of absence, then and in that event the running of the then current term or period of the employee's employment hereunder shall be deemed to be interrupted during the period of such suspension, refusal to pay or leave of absence, but shall be resumed immediately upon the expiration of such suspension or leave of absence, or (in case of any such refusal to pay) upon the resumption of the payment of compensation, and (subject to subsequent extension or termination for proper cause) shall continue from and after the date of such resumption for a period equal to the unexpired portion of such term or period at the time of the commencement of such suspension, refusal to pay or leave of absence, less a period equal to that portion, if any, of the period of such suspension, refusal to pay or leave of absence for which the producer does not exercise the right to extend this agreement. In the event of any such extension the dates for the exercise of any subsequent options and the dates of the commencement of any subsequent optional period or periods of employment hereunder shall be postponed accordingly. During the period of any such suspension, refusal to pay or leave of absence the employee shall not have the right to render his services to or for any person, firm or corporation other than the producer without the written consent of the producer first had and obtained. Should the producer pay any money or compensation to the employee for or during all or any part of any period in which this agreement is suspended, or in which the employee is not entitled to compensation, or in which the producer is entitled to refuse to pay com-

pensation to the employee, then and in that event, at the option of the producer, the money and/or compensation so paid the employee shall be returned by the employee to the producer upon demand, or the same may be deducted by the producer from any compensation earned hereunder by the employee after such period, but this provision shall not be deemed to limit or exclude any other rights of credit or recovery, or any other remedies the producer otherwise may have. Wherever in this agreement reference is made to the phrases "the term hereof", "the term of this agreement", or other phrases of like tenor, such reference (unless a different meaning clearly appears from the context) shall mean and be deemed to refer to the original period of the employee's employment hereunder and/or to whichever of the optional periods of employment provided for in paragraph 18 hereof may be current at the time referred to.

13. No waiver by the producer of any breach of any covenant or provision of this agreement shall be deemed to be a waiver of any preceding or succeeding breach of the same or any other covenant or provision.

14. All notices which the producer is required or may desire to serve upon the employee under or in connection with this agreement may be served by addressing the same to the employee at such address as may be designated from time to time in writing by the employee, or if no such address be designated in writing by the employee, or, if having designated an address, the employee cancels the same and fails to designate a new address in writing, then by addressing the same to the employee at any place where the producer has a studio or an office and, in any case, by depositing the same so addressed, postage prepaid, in the United States mail, or by sending the same so addressed by telegraph or cable or, at its option, the producer may deliver the same to the employee personally, either in writing or, unless otherwise specified herein, orally. If the producer elect to mail such notice or to send the same by telegraph or cable, such notice shall be deemed to have been served upon the employee on the date of the mailing thereof, or the date of delivery thereof to the telegraph or cable office, as the case may be, and for this purpose the employee designates and appoints the United Postoffice, or telegraph or cable company, as the case may be, his agent to receive such notices.

15. Nothing in this contract contained shall be construed so as to require the commission of any act contrary to law, and wherever there is any conflict between any provision of this agreement and any material present or future statute, law, governmental regulations or ordinance, contrary to which the parties have no legal right to contract, the latter shall prevail, but in such event the provision of this agreement affected shall be curtailed and limited only to the extent necessary to bring it within the legal requirements.

16. The producer may transfer or assign all or any part of its rights hereunder to any person, firm or corporation, and this agreement shall inure to the benefit of the producer, its successors or assigns.

17. On condition that the employee shall fully and completely keep and perform each and every term and condition of this agreement on his part to be kept or performed, the producer agrees to compensate the employee therefor and for all rights herein granted and/or agreed to be granted by the employee to the producer at the rate of One Thousand, One Hundred Fifty and 00/100 Dollars ($1,150.00) per week during each year of the term, payable for each week during which the employee shall have actually rendered his services hereunder. Conditioned as aforesaid, the producer agrees that compensation will be paid to the employee for a period or aggregate of periods of not less than forty (40) weeks during each year of the original term hereof and for a period or aggregate of periods of not less than forty (40) weeks during each year of each optional period of employment for which an option is exercised hereunder. In computing compensation to be paid or deducted with respect to any period of less than a week, the weekly rate shall be prorated, and for this purpose the rate per day shall

be one-sixth (⅙th) of the weekly rate. If during the original term hereof or during any optional period of employment for which an option is exercised hereunder this agreement be suspended pursuant to any provision for suspension herein contained, or if the producer refuse to pay the employee compensation pursuant to any right to do so herein granted to the producer, then the minimum periods hereinabove specified during which the producer is obligated to pay compensation to the employee shall be reduced by a period equivalent to the period or aggregate of periods of such suspension or suspensions or refusal to pay. Any compensation due the employee hereunder shall be payable on Thursday of each week for services rendered up to and including the Saturday preceding. During any period or periods in which the employee is not entitled to compensation pursuant to the provisions of this paragraph, he shall be deemed to be laid off without pay, and during such periods, of course, the employee shall not have the right to render his services for any person, firm or corporation without the written consent of the producer first had and obtained.

18. The term of employment hereunder shall be deemed to have commenced on November 15, 1945 and shall continue for a period of two years from and after said date. In consideration of the execution of this agreement by the producer and of the consent of the producer to the amount of compensation herein set forth, the employee hereby gives and grants to the producer the following rights or options:

(a) To extend the term of employment of the employee for an additional period of two (2) years from and after the expiration of the term hereinbefore specified, upon the same terms and conditions as herein contained, except that compensation shall be paid to the employee for this first extended period at the rate of One Thousand, Three Hundred Fifty Dollars ($1,350.00) per week.

(b) To extend the term of employment of the employee for an additional period of two (2) years from and after the expiration of said first extended period, upon the same terms and conditions as herein contained, except that compensation shall be paid to the employee for this second extended period at the rate of One Thousand, Five Hundred Fifty Dollars ($1,550.00) per week.

(c) To extend the term of employment of the employee for an additional period of one (1) year from and after the expiration of said second extended period, upon the same terms and conditions as herein contained, except that compensation shall be paid to the employee for this third extended period at the rate of One Thousand, Eight Hundred Dollars ($1,800.00) per week.

Each option hereinabove referred to may be exercised separately at any time, but not later than thirty (30) days prior to the expiration of the respective next preceding term of employment. If any such term is extended as provided in this agreement, the period of thirty (30) days referred to in the next preceding sentence shall be the period of thirty (30) days prior to the expiration of all extensions of such term, whether the right to such extension or extensions accrued or was exercised before, on or after the date which in the absence of such extension or extensions would have been the latest date for the exercise of such option. The producer at any time within which any of said options may be exercised, may elect to exercise all or any of the options not already exercised, in which event the term of this agreement shall be extended by the period or periods specified in the option or options so exercised by the producer. The exercise by the producer of any one or more of said options shall not be construed as an election by it not to exercise the remaining options and shall not be construed to be a waiver of any prior breach by the employee, whether known or unknown, of any provision of this agreement or a ratification of any prior course of conduct by the employee. All notices of the exercise of any option shall be in writing and shall be served upon the employee within the periods above specified.

19. The employee warrants and represents to the producer and agrees that the employee is a member in good standing of the Screen Writer's Guild, Inc. and will remain so during any and all periods that his services are required as a writer hereunder.

20. The Producer-Screen Writers' Guild Inc. Minimum Basic Agreement of 1942 (as it may from time to time hereafter be modified, amended or extended) is hereinafter referred to as the "Basic Agreement". The provisions of Article 5 of said Basic Agreement shall govern the determination of such credits as a writer, if any, as the producer shall accord the employee hereunder; it being agreed, however, that with respect to credits not finally determined during the term of said Basic Agreement, and with respect to credits finally determined at any time when the producer shall have ceased to be a party to said Basic Agreement or when said Basic Agreement is not effective as between the producer and the Guild, any screenplay credits to the employee as a writer shall be determined in accordance with the provisions of Exhibit "X" attached hereto.

21. If, during the term hereof, the employee shall notify the producer in writing that the employee desires to take a leave of absence and if such request shall be granted by the producer then, unless the producer in granting such leave of absence shall advise the employee to the contrary, the employee may, during such leave of absence, engage in the writing of literary and/or dramatic material for himself but shall not have the right to accept employment with or engage in the writing or preparation of literary or dramatic material for any person, firm or corporation other than the producer. It is expressly understood that nothing contained in this paragraph shall obligate the employee to request any leave of absence whatsoever nor shall anything in this paragraph be construed so as to obligate the producer to grant the author any leave of absence requested by him. The employee agrees that promptly upon the completion of any and all literary and/or dramatic material written by him, as aforesaid, during any such leave of absence, he will submit the same to the producer. The producer shall have the right, to be exercised by notice in writing to be served upon the employee at any time within thirty (30) days after such submittal, to purchase, for a price to be agreed upon between the employee and the producer, all rights of every kind in and to such material, including specifically, but not limiting the same to, the sole and exclusive motion picture, sound, radio, television and spoken stage rights therein throughout the world, or such of said rights therein as the producer may elect to acquire. If the producer does not elect to purchase such rights, or any of them, within said period of thirty (30) days, or if a price cannot be agreed upon between the employee and the producer, the employee shall have the right to negotiate for the sale of such rights, or any of them, to others than the producer; provided, however, that such rights shall not, nor shall any of them, be sold, licensed or conveyed to anyone other than the producer unless and until, in each instance, the producer shall have been given an opportunity and shall have failed to avail itself thereof within forty-eight (48) hours (excluding Sundays and holidays) after such opportunity is presented to the producer in writing to purchase the rights so proposed to be sold, licensed or conveyed, for a price at least as favorable as that contained in the offer which the employee contemplates accepting from such other person. Any such offer, in order to foreclose the rights of the producer, as above provided, must of course be bona fide. With respect to any and all material and rights purchased by the producer pursuant to the foregoing provisions of this paragraph, the employee agrees to execute and deliver to the producer such assignment or assignments of such material and/or rights and such other instruments as in the sole judgment and discretion of the producer may be deemed necessary or expedient for the transfer to the producer of the material and/or rights so purchased; it being expressly agreed that all material and/or rights so purchased by the producer shall vest in and inure to the benefit of the producer forthwith upon the purchase thereof by the producer whether or not such assignments

and/or other instruments be executed by the employee or delivered to the producer, and the employee shall be deemed to have made the same warranties and representations to the producer with respect to the originality and authorship of such material and the employee's ownership thereof as are set forth in Exhibit "A" attached hereto.

22. The original term hereof and each optional period of employment for which an option is exercised under the provisions of paragraph 18 hereof shall be deemed to consist of separate, consecutive yearly periods equivalent in number to the number of years in the term concerned, each of which yearly periods is herein referred to as a "year of the term". In the event of the occurrence of any contingency or leave of absence during any year of the term by reason of which the producer is entitled under any of the provisions of this agreement to suspend or withhold payment of compensation to the employee and to extend the respective term of this agreement for a period equal to all or any part of the period of such suspension or withholding of compensation, the producer shall also have the right to extend the year of the term in which such leave of absence or contingency occurs, for a period equal to all or any part of the period of the continuance thereof, which right of extension may be exercised by the producer at any time prior to the expiration of such year of the term. The period referred to as a "year of the term" shall be deemed to include all such extensions of the respective year. The right to extend a year of the term shall be in addition to and not in lieu or limitation of any other rights which the producer may have under the provisions of this agreement or otherwise; it being expressly understood, without limiting the foregoing, that the exercise by the producer of the right to extend any year of the term shall not prejudice or impair the producer's right at the same time or at any time thereafter for the same or any other cause to exercise the right elsewhere herein granted to the producer to extend the term of this agreement, nor shall the failure of the producer to exercise the

right to extend any year of the term prejudice or impair the producer's right, for the same or any other cause, to exercise the right elsewhere herein granted to the producer to extend the term of this agreement at any time prior to the expiration of said term, nor shall the exercise of such right of extension of a year of the term operate as an extension of or obligate the producer to extend the respective term of this agreement. In the event that any year of the term be extended, as aforesaid, the commencement of the subsequent year or years of the term, if any, shall be postponed for an equivalent period of time, it being agreed that the subsequent year of the term, if any, shall not begin until the expiration of all extensions, if any, of the next preceding year of the term. In the event that any year of the term be extended, as aforesaid, and if the respective term of this agreement is not extended for an equivalent period or periods, then the year of the term which is current at the expiration of the term of this agreement shall, of course, end at the same time as the term, and the remainder of such year of the term and any unexpired balance of the minimum period for which compensation is payable by the producer in respect of such year and any subsequent year or years of the term shall be deemed to be cancelled and eliminated.

23. If the compensation provided by this contract shall exceed the amount permitted by any present or future law or governmental order or regulation, such stated compensation shall be reduced while such limitation is in effect to the amount which is so permitted; and the payment of such reduced compensation shall be deemed to constitute full performance by the producer of its obligations hereunder with respect to compensation for such period.

24. The employee hereby agrees that the producer may, as his employer, deduct and withhold from the compensation payable to the employee hereunder the amounts required to be deducted and withheld by the producer as the employer of the employee under the provisions of any statute, law, regulation or ordinance heretofore or

hereafter enacted requiring the withholding or deducting of compensation.

In Witness Whereof the parties hereto have executed this agreement the day and year first above written.

Loew's Incorporated

By Louis K. Sidney
<u>Asst. Treasurer</u>

Lester Cole
<u>(Lester Cole)</u>

Exhibit "B"

Loew's Incorporated

Metro-Goldwyn-Mayer Pictures

Culver City

California

August 21, 1947

Mr. Lester Cole

% Metro-Goldwyn-Mayer Studios

Culver City, California

Dear Mr. Cole:

This will constitute the following agreement between us with reference to your contract of employment ·with us dated December 5, 1945, as amended:

1. We elect to and do hereby exercise the option granted us under the terms of subdivision (a) of paragraph 18 of the aforesaid contract of employment. The term of your employment is, therefore, extended for an additional period of two (2) years from and after the expiration of the present term of said contract of employment upon the same terms and conditions as contained in said contract of employment, except that compensation will be paid to you during said extended period at the rate of One Thousand Three Hundred Fifty Dollars ($1,350.00) per week, and except as hereinafter specifically provided:

2. We do hereby warrant and agree that during the term of employment provided for in subdivision (a) of paragraph 18 of said contract of employment we will not apply layoff. You will accordingly be compensated each week of each year of said extended period at the rate hereinabove provided for, subject, however, to all other terms, conditions, rights and remedies of said contract of employment.

3. On condition that you shall fully and completely keep and perform each and all of the obligations and agreements on your part to be kept and performed under the terms and conditions of said contract of employment, during each year of said extended period hereinabove mentioned, you shall be entitled to a vacation of six (6) consecutive weeks with pay during each year of said extended period; each such vacation with pay ·being ·hereinafter referred to as the "paid vacation". Each such paid vacation shall commence at such time during each year of said extended period as may be designated by us, on not less than one (1) week's notice to be given ·by us to you; it ·being understood that the designation by us of the date for the commencement of either such paid vacation shall not preclude us from thereafter ·changing such date of commencement and ·designating an earlier or later date for the commencement of each such paid vacation. It is further understood and agreed that, if on the date designated by us for the commencement of each such paid vacation you are engaged in rendering your services in connection with any assignment, which, in our opinion, is not then completed, the commencement of such paid vacation may, at our option, be postponed until the completion of all services which we may require of you in connection with such photoplay.

4. It is further understood and agreed that, during each year of said extended period, if you so elect, you shall be entitled to an additional vacation, without pay, for a period of time which shall not, in any event, except as hereinafter specifically set forth, exceed six (6) consecutive weeks (said additional vacation being hereinafter referred to as the "unpaid vacation"), providing you notify us to that effect, in writing, not later than two (2) weeks prior to the date that you are desirous of commencing such unpaid vacation. Such written notice shall specify the date of commencement and the desired duration of such unpaid vacation. Said unpaid vacation shall commence at such time during each year of the extended period hereinabove mentioned as may be designated by you, as aforesaid; it being agreed, however, that the designation ·by you of a date for the commencement of any

such unpaid vacation shall not preclude us from thereafter changing such date of commencement and designating a later date for the commencement of such unpaid vacation, in the event you are engaged in rendering services in connection with any uncompleted assignment or assignments upon the date designated by you for the commencement of such unpaid vacation; in which event, said unpaid vacation shall commence upon the day following the completion of all of the services which we may require of you in connection with any such assignment or assignments. It is specifically understood and agreed that, with respect to the first year of the extended period hereinabove mentioned, the unpaid vacation may be consecutive with, and contiguous to, in point of time, the paid vacation, provided you advise us, in writing, to that effect not later than one (1) week after we shall have designated a date for the commencement of the paid vacation during said first year, but with respect to the second year of the extended period hereinabove mentioned, the unpaid vacation shall not, without our consent, be consecutive with or contiguous to, in point of time, the paid vacation to which you are entitled during the second year of the extended period above mentioned. With reference only to the first year of said extended period, provided that said paid and unpaid vacations applicable to the first year of said extended period, shall not be consecutive, or contiguous to or with each other, in point of time, and further provided that, after having commenced said unpaid vacation applicable to the first year of said extended period, it is apparent that said unpaid vacation will terminate at some time between June 18, 1948 and September 20, 1948, you shall have the right and/or privilege, to extend said unpaid vacation for a period of time not in excess of three (3) weeks, and, in any event, not beyond September 20, 1948, upon condition, however, that you will notify us in writing to that effect, not later than the end of the first week of said unpaid vacation and you will include in said notice the date that you are desirous of terminating said unpaid vacation, as extended, which, of course, shall be subject to the limitations on the extension thereof as hereinbefore specifically provided for in this sentence. In the event you elect to and do take any unpaid vacation, as aforesaid, such unpaid vacation shall be treated as a leave of absence granted to you by us and all provisions pertaining to leaves of absence contained in your aforesaid contract of employment with us shall apply to any such unpaid vacation or vacations. Without limiting the generality of the next preceding sentence, it is expressly agreed that such unpaid vacation or vacations shall be treated as a leave or leaves of absence within the meaning of paragraphs 11, 12 and 22 of your aforesaid contract, of employment with us, and we shall have the right, at our option, to extend the term of your aforementioned contract of employment and, as well, the year of the term which is current at the time any such unpaid vacation is taken by you, and to postpone the commencement of the next year of the term for a period of time equivalent to all or any part of any unpaid vacation granted to you pursuant hereto. It is also understood and agreed that during any vacation period hereunder, whether "paid" or "unpaid", you shall not have the right to render services to or for yourself or to or for any person, firm or corporation other than us.

Except as hereinabove expressly provided, said contract of employment dated December 5, 1945, as amended, is not further changed, altered, amended or affected in any manner or particular whatsoever.

If the foregoing is in accordance with your understanding and agreement, kindly indicate your approval and acceptance thereof in the space hereinbelow provided.

Very truly yours,
Loew's Incorporated
By Louis K. Sidney
Asst.-Treasurer

Approved and Accepted:
Lester Cole
(Lester Cole)
ECdeL:rm 9–18–47